[S. F. No. 22505. In Bank. July 28, 1967.]

GLEN RAY AKINS, a Minor, etc., Plaintiff and Appellant, v. COUNTY OF SONOMA et al., Defendants and Respondents.

186

DeMeo, DeMeo, Foster & Waner and John F. DeMeo for Plaintiff and Appellant.

Ball, Hunt, Hart & Brown, Joseph A. Ball and Elmer G. Hitt as Amici Curiae on behalf of Plaintiff and Appellant.

Lounibos & Lounibos, Leroy J. Lounibos, Sedgwick, Detert, Moran & Arnold and James L. Gault for Defendants and Respondents.

BURKE, J.—In this personal injury action plaintiff, a minor appearing by his guardian *ad litem,* appeals from an adverse judgment entered on a jury verdict in favor of defendants, the County of Sonoma and Bay Promotions, Inc. (hereinafter "Bay"). Plaintiff's injuries were allegedly suffered when he fell from his seat on the top row of bleachers onto a concrete floor at the Sonoma County Fairgrounds in Santa Rosa while attending a roller derby exhibition. The county owned the fairground premises and the bleachers, and Bay was the promoter of the roller derby exhibition. As will appear, we have concluded that the case was fully and fairly tried, that no error prejudicial to plaintiff occurred, and that the judgment should be affirmed.

On an evening in May 1962 plaintiff's parents took plain-

tiff, then two years and eleven months old, and their three older children, aged eight, six and four and one-half years, to the roller derby exhibition at the county fairgrounds. Defendant Bay, which sponsored and promoted the exhibition, rented the fairground pavilion from the county. The Akins arrived at the fairgrounds at approximately 6:45 p.m., purchased tickets for admission to the exhibition, and seated themselves on the east side of the pavilion in one of the three sections of portable bleachers which had been provided by the county to accommodate spectators at the exhibition. Just before the half-time intermission of the roller derby exhibition the Akins moved from their seats about half way up in the bleachers to the top row of the bleacher seats. Following the intermission the Akins remained in these seats, with plaintiff sitting at the end of the family group next to his four and one-half-year old sister on one side and a stranger, Mr. Reynolds, on the other. At approximately 9:45 p.m., some 10 to 20 minutes after the second half had begun, plaintiff fell from his seat in the bleachers through an open space between the rear of his seat and a horizontal back rail above and behind, landing on the concrete floor of the pavilion some 10 to 15 feet below. Plaintiff was then 38 to 39 inches in height and weighed some 37 pounds.

From the record it appears that the bleacher section consisted of approximately 13 tiered boards for seating. Each seat board was approximately 9 inches wide. The bleachers were not against a wall but were instead supported by a type of scaffolding. The vertical bars of the scaffolding extended approximately 4 feet above the top seat board of the bleachers, where they were used to support three tubular horizontal bars which provided a backing in the form of a railing for the top row seats. The distance between the rear edge of the top row seat board and the vertical bars was 7 inches (i.e., the vertical bars were 7 inches behind the rear edge of the seat board); and the diagonal distance between the rear edge of the top row seat board and the lowest horizontal bar of the railing was 12 inches.

No one in plaintiff's family saw him fall nor did plaintiff's father discover anyone who witnessed the fall. Although prior to the fall plaintiff's father observed that plaintiff was sitting watching the game, the father's attention at the time of the fall was directed to the activity of the skaters, who were then in a jam session. Mr. Reynolds, who was seated next to plaintiff, testified that he felt plaintiff's leg bump him at the time

of the fall but did not see plaintiff fall and could not state whether plaintiff was then sitting or standing; that he had never observed plaintiff stand on the top row seat; that before the accident he had on several occasions seen plaintiff reseat himself after standing to watch a jam, and that in reseating himself plaintiff slid back as he sat on the seat, "kind of wiggling back and get back where he wanted to sit to be comfortable." In addition, Reynolds admitted that he told the policeman who made a report of plaintiff's accident that plaintiff was wiggling around and suddenly fell through the bleachers. Plaintiff's father testified that when he questioned plaintiff some time after the accident as to how the fall had occurred, plaintiff replied, "I fell off watching roller derby . . . I was sitting there and I fall off."

The county had owned the bleachers at the fairgrounds since 1948 and had furnished them to various organizations, including defendant Bay, which had rented the pavilion for various types of exhibitions. It was the county's responsibility to assemble and disassemble the bleachers, which were of the portable type, and to maintain and repair them. James Lyttle, who was employed by the county as general manager of the fair and who in that capacity was charged with the responsibility of overseeing the maintenance and repair of the pavilion and the bleachers and of renting them out for the county for various events, testified that he had personally inspected the bleachers from time to time before plaintiff's fall and was aware that there was a space large enough for a child to fall through between the top row seat and the first railing behind that seat; that he had seen children present and sitting on the bleachers at various events at the fairgrounds before plaintiff's accident; that he expected children to be in attendance at the roller derby exhibition; that although he did not expect children of the age of two or three to be seated on the top row of the bleachers unless they were under full control of their parents, he did expect children to be seated wherever they wished.

Mr. Degenkolb, a structural engineer who had personally designed bleachers, testified that the bleachers at the fairgrounds were normal, standard bleachers and were in conformity with general engineering standards of safety, but that a child of plaintiff's size (38 inches tall and weighing 37 pounds) could fall through the open space in question while he was sitting on the top row of the bleachers.

It further appears from the record that the roller derby

exhibition as sponsored by Bay had been advertised through various media including the mails, television, and newspapers; that it was advertised as a good. clean sport for the whole family and for children and adults of all ages from 2 months to 70 years; that newspaper advertising purchased by Bay advertised the price of admission for children; and that television advertising encouraged the bringing of children to the roller derby exhibition. Plaintiff's father testified that on the night of plaintiff's fall he saw other young children at the roller derby exhibition and noticed that some of them were sitting and others were playing on the top row seats of the bleachers. Mr. Reynolds also testified that he saw children of all ages and sizes present at the roller derby on the night of the accident, and that he had seen children of all ages and sizes on the top row seat on the same bleachers on prior occasions.

Neither the county nor Bay had posted signs on the fairground premises warning spectators concerning the open space which existed behind the top row seat of the bleachers; no instructions were ever given to any county employee with respect to warning the public about such open space; and the county gave no instructions to Bay or to any of its employees with respect to the open space or warning the public of the space.

In addition, Mr. Seltzer, the president of Bay, testified that Bay had been exhibiting roller derby to the public at the fairgrounds since 1961 and had used the county's portable bleachers on such occasions; that although he had been to the fairground premises before the date of plaintiff's fall he had at no time noticed that an open space existed between the top row seat and the horizontal railing behind the seat; that Bay had ushers on duty on the night of the accident, but they were hired not to seat people but to ascertain whether ticket holders were in the proper section.

Plaintiff contends that various asserted errors occurred at the trial, particularly in instructing the jury, which require reversal of the judgment.

Preliminarily it should be noted that the 1963 Tort Claims Act applies. (See *Cabell* v. *State of California, ante,* p. 150 [60 Cal.Rptr. 476, 430 P.2d 34].)

*Safety Orders, Administrative Regulations and Local Building Codes*

Plaintiff requested the trial court to instruct the jury in terms of various General Industrial Safety Orders contained

in title 8 of the California Administrative Code, various Regulations of the State Fire Marshal contained in title 19 of the Administrative Code, and various sections of the building codes adopted by the County and by the City of Santa Rosa.[1] Plaintiff also offered an instruction to the effect that if either defendant violated any of such safety orders, regulations, or building code provisions a presumption of negligence arose as to that defendant which could be overcome by evidence showing that, under all the circumstances surrounding the event, such defendant's conduct was excusable or justifiable. The court refused to give any of these requested instructions and informed the jury at the conclusion of the trial that as a matter of law no safety regulations were applicable to the case.[2]

*General Industrial Safety Orders.* The benefit of such safety orders, where applicable, has been extended by judicial decision in this state to the general public in places of employment. (*Porter* v. *Montgomery Ward & Co., Inc.* (1957) 48 Cal.2d 846, 849 [313 P.2d 854].) Plaintiff in his brief undertakes to summarize the safety orders he cites, but makes little or no effort to relate them to the facts of this case. In reviewing such orders it would appear that the only one having possible applicability is section 3237, which requires that platforms be at least 2 feet wide and equipped with toeboards and standard railings on all open sides.[3] A platform is defined in section 3215 as "an elevated working level for persons." Section 3223 defines working level as "a platform, walkway, runway, floor or similar area fixed with reference to the hazard and used by employees in the course of their employment." Although it is undisputed that county employees assembled, disassembled, maintained and repaired the bleachers, and stood on them to do so, it cannot be said

---

[1]The fairground premises here involved are located in Santa Rosa.

[2]For breach of any applicable safety regulations, the liability of a public entity is set forth as follows in section 815.6 of the Government Code, enacted as a part of the 1963 legislation: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

[3]Sections 3238 and 3239 set forth requirements for wall openings and floor holes, neither of which is applicable since the bleachers here involved contained no wall openings or floor holes as those terms are defined in sections 3211, 3212 and 3222.

that the bleachers were "used by employees in the course of their employment" as that phrase is used in section 3223 to define a "working level for persons." The bleachers were designed to provide seating for spectators and not as a "working level for persons." Accordingly, the subject safety orders did not apply to the facts of this case, and the trial court correctly refused to instruct the jury in terms of such orders.

■ *Regulations of State Fire Marshal.* Nor did the court err in refusing to instruct in terms of the title 19 sections cited by plaintiff. The bleachers here involved were equipped with a back railing and so were in compliance with former section 269. Sections 33.15 and 57.16 were not in effect at the time of plaintiff's accident, and thus were not relevant to defendants' standard of conduct. (See *Zellers* v. *State of California* (1955) 134 Cal.App.2d 270, 276 [285 P.2d 962]; *Beeks* v. *Joseph Magnin Co.* (1961) 194 Cal.App.2d 73, 79-80 [14 Cal.Rptr. 877].) Accordingly, the court correctly refused to instruct as to sections 3 and 4 of the regulations, which merely defined the purpose of the regulations and made them applicable in certain types of buildings.

*County and City Building Codes.* The county building code section cited by plaintiff contains the same provision as that found in former section 269 of the State Fire Marshal Regulations, i.e., a back railing was required. As noted, a back railing was provided here, and accordingly there was no occasion to instruct in terms of such section.

■ The city building code sections found in the Santa Rosa ordinances cited by plaintiff do not apply, as the county-owned property was exempt from the city ordinances. (Gov. Code, §§ 53090-53091; see also 40 Ops.Cal.Atty.Gen. 245; *County of Los Angeles* v. *City of Los Angeles* (1963) 212 Cal.App.2d 160, 166 [4] [28 Cal.Rptr. 32].) The court's refusal to instruct in terms of such sections was correct.

*Instructions Relating to Public Liability Act as Being the Sole Basis for the County's Liability*

■ At the county's request the court instructed the jury that "Plaintiff's cause of action, if any he has, against the defendant County of Sonoma, is based upon and must meet the requirements of a law of this state known as the Public Liability Act," and then proceeded to instruct on the meaning of the provisions of that act. Since plaintiff has shown no violation of an applicable statute, safety order, or ordinance, it follows that there is no merit in his argument that such

instructions were erroneous in that they effectively eliminated from consideration the county's liability for breach of a mandatory duty. (Gov. Code, § 815.6.)

*Res Ipsa Loquitur Doctrine*

Plaintiff's contention that the trial court erred in determining as a matter of law that the doctrine of res ipsa loquitur is not applicable in this case, and in refusing to give plaintiff's proffered instructions on the subject, also lacks merit. As stated in *DiMare* v. *Cresci* (1962) 58 Cal.2d 292, 299 [23 Cal.Rptr. 772, 373 P.2d 860] : ''The introduction of evidence of specific acts of negligence does not deprive the plaintiff of the benefit of the doctrine [of res ipsa loquitur] *unless the facts as to the cause of the accident and the care exercised by the defendant are shown as a matter of law thus eliminating any justification for resort to the inference of negligence.* [Citations.] '' (Italics added.)

In the present case the facts are undisputed as to how the accident happened and the care exercised by defendants. There is no dispute as to the condition of the bleachers from which palintiff fell. The issue is whether the undisputed conduct of defendants constituted negligence which proximately contributed to plaintiff's injuries, and there is no room for resort to inference as to what defendants did or did not do. Accordingly, the court was correct in ruling that the res ipsa loquitur doctrine did not apply.

*The "Mere Happening of the Accident" Instruction*

Based on the assertions that a res ipsa instruction should have been given as well as a negligence per se instruction for violations of assertedly applicable safety orders, administrative regulations and local building codes (see *Alarid* v. *Vanier* (1958) 50 Cal.2d 617, 625 [327 P.2d 897]), plaintiff also contends that the trial court erred in giving the ''mere happening of the accident'' instruction.[4] But as already discussed, the court correctly refused the res ipsa instruction as well as instructions based on the asserted violations ; hence plaintiff's contention must fall.

*Instruction Defining "Dangerous or Defective Condition"*

At the county's request the court instructed as follows concerning the term ''dangerous or defective condi-

---

[4]This instruction reads: ''The mere fact that an accident happened, considered alone, does not prove that it was caused by the negligence of anyone.''

tion'' as that term was used in the Public Liability Act: ''A dangerous or defective condition, as denoted by the use of that term in these instructions, means a condition of the bleachers in question that would have caused them to be not reasonably safe for *persons who, with ordinary care for their own safety,* used . . . them . . . .''

Contributory negligence was not an issue at the trial of this case, and defendants agree that the court properly instructed the jury that as a matter of law the infant plaintiff was not guilty of contributory negligence. Plaintiff contends that the underlined portion of the instruction defining ''dangerous or defective condition'' was ''repugnant to the conclusive presumption against . . . contributory negligence which clothed'' plaintiff, and was prejudicially erroneous.

■ [See fn. 5] However, the instruction was in substantially the same terms as the definition set forth in the 1963 Tort Claims Act.[5] ■ Therein ''dangerous condition'' is defined as ''a condition of property that creates a substantial . . . risk of injury when such property . . . *is used with due care* in a manner in which it is reasonably foreseeable that it will be used.'' (Gov. Code, § 830, subd. (a); italics added.) The Law Revision Commission comment with respect to this definition is in pertinent part as follows:

''Thus, even though it is foreseeable that persons may use public property without due care, a public entity may not be held liable for failing to take precautions to protect such persons. The definition would, however, take into consideration the standard of care that would be applicable to foreseeable users of the property. Where it is reasonably foreseeable that persons to whom a lower standard of care is applicable— such as children—may be exposed to a substantial risk of injury from the property, the public entity should be required to take reasonable precautions to protect such persons from that risk. Thus, a public entity may be expected to fence a swimming pool or to fence or lock up a dangerous instrumentality if it is reasonably foreseeable that small children may be injured if such precautions are not taken.'' (See also Van Alstyne, Cal. Government Tort Liability (Cont. Ed. Bar) pp. 195-196, wherein it is pointed out that this view appears to be consistent with prior law.)

---

[5] Both under the Public Liability Act and under the 1963 legislation public property is in a dangerous or defective condition when it ''involves an unreasonable risk of injury to the public.'' (*Teall* v. *City of Cudahy* (1963) 60 Cal.2d 431 [34 Cal.Rptr. 869, 386 P.2d 493].)

In the present case the trial court at plaintiff's request instructed the jury with respect to the lower standard of care expected from young children, pointing out that they usually do not exercise the same degree of prudence as adults.[6] It is thus apparent that the instructions taken as a whole accorded to plaintiff the benefit of the lesser standard of care anticipated from one of his brief years, and that the underscored portion of the instruction of which he complains was neither erroneous nor prejudicial to him.

*Stricken Portion of "License Agreement"*

Although the so-called license agreement between the County and Bay was introduced into evidence, the trial court informed the jury at the conclusion of the trial that it had stricken from the agreement paragraph 17 thereof which provides that "All safety orders of the Division of Industrial Safety, Department of Industrial Relations, must be strictly observed." Since, as already stated, none of such orders was applicable in this case, no error is shown in striking the quoted paragraph.

*Stricken Portion of Brinegar Deposition*

The trial court struck from the deposition of the witness Mr. Brinegar, a retired engineer of the Division of Industrial Safety who was unable to attend the trial because of illness, statements as to his opinion that the bleachers from which plaintiff fell did not conform to certain safety orders. Since, as noted above, such orders were not applicable, no prejudice to plaintiff appears.

*The Asserted Negligence of Plaintiff's Parents[7]*

On the first morning of trial and prior to the commencement of the *voir dire* examination of the jury, plaintiff made a motion *in limine* to restrict the *voir dire* and to preclude the introduction of evidence with regard to alleged negligence on

---

[6]The instruction reads as follows: "Ordinarily it is necessary to exercise greater caution for the protection and safety of a young child than for an adult person who possesses normal physical and mental faculties. One dealing with children must anticipate the ordinary behavior of children. The fact that they usually cannot and do not exercise the same degree of prudence for their own safety as adults, that they often are thoughtless and impulsive, imposes a duty to exercise a proportional vigilance and caution on those dealing with children, and from whose conduct injury to a child may result."

[7]All matter appearing under this heading and the next heading (The "Sole Proximate Cause" Instruction) is quoted from the opinion of Mr. Presiding Justice Molinari in *Akins* v. *County of Sonoma*, while this case was pending in the Court of Appeal.

the part of plaintiff's parents in failing to properly supervise plaintiff. This motion was denied by the court. Accordingly, evidence was introduced concerning the degree of supervision and control which plaintiff's parents exercised towards plaintiff at the roller derby exhibition and in addition during *voir dire* examination of the jury and opening and closing arguments counsel for both defendants made numerous references to the duty of a parent to supervise his child and to the fact that defendants would be absolved from liability if the jury determined that the negligence of plaintiff's parents was the sole cause of plaintiff's fall. ▮ Plaintiff contends that since plaintiff's parents were not parties to this action and since any alleged negligence on their part could not be imputed to plaintiff to bar his recovery, the question of the negligence of plaintiff's parents was not a proper issue in the instant case. Moreover, plaintiff argues that as a result of the trial court's allowing this question to be considered by the jury, ''The real issues as to Respondent's legal responsibility in the case were completely obscured if not obliterated.''

▮ While it is true that the negligence, if any, of parents is not imputable to the child in an action by the latter for injuries (*Zarzana* v. *Neve Drug Co.* (1919) 180 Cal. 32, 35-37 [179 P. 203, 15 A.L.R. 401]; *Crane* v. *Smith* (1943) 23 Cal.2d 288, 301 [144 P.2d 356]; *Reynolds* v. *Willson* (1958) 51 Cal.2d 94, 102 [331 P.2d 48]), such negligence may nevertheless be relevant in determining whether a third person is liable for such injuries.

▮ In the instant case, the question of the negligence of plaintiff's parents was relevant, firstly, in determining whether defendants were in fact negligent. ▮ As stated in section 302A of the Restatement Second of the Law of Torts, ''An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another *through the negligent or reckless conduct of . . . a third person.*'' (Italics added; p. 86; see also *Kaukonen* v. *Aro* (1956) 142 Cal.App.2d 502, 505 [298 P.2d 611]; Prosser, Torts (3d ed. 1964) § 33, pp. 168, 173-176.) The converse of this principle is obviously that a person does not act negligently if he cannot be expected to reasonably foresee the existence of an unreasonable risk of harm to another through the intervention of negligence of a third person.

▮ The negligence of plaintiff's parents was also relevant on the issue of actual causation. ▮ In order to hold defendants liable it was necessary for plaintiff to show that

the negligence of defendants, or either of them, contributed in some way to plaintiff's injury, "so that 'but for' the defendant's negligence the injury would not have been sustained." (2 Witkin, Summary of Cal. Law (1960) Torts, § 284, p. 1484; see Rest.2d Torts, § 432, p. 430.) Accordingly, although defendants, if found to be negligent, would not be relieved from liability simply because the negligence of plaintiff's parents concurred with defendants' negligence in causing plaintiff's injury, defendants would not be liable for plaintiff's injuries if, despite their negligence, plaintiff would have sustained the same injuries as a result of the negligence of his parents. In other words, if because of lack of supervision by his parents, plaintiff would have fallen from the bleachers even if defendants had provided safe seating arrangements and had adequately supervised the seating at the fairgrounds, then defendants' negligence would not be the "cause in fact" of plaintiff's injuries.

Finally, the question of the negligence of plaintiff's parents is relevant as to the issue of proximate cause. This issue is concerned with whether or not, assuming that a defendant was negligent and that his negligence was an actual cause of the plaintiff's injury, the defendant should be held responsible for the plaintiff's injury where the injury was brought about by a later cause of independent origin. This question, in turn, revolves around a determination of whether the later cause of independent origin, commonly referred to as an intervening cause, was foreseeable by the defendant or, if not foreseeable, whether it caused injury of a type which was foreseeable. If either of these questions is answered in the affirmative, then the defendant is not relieved from liability towards the plaintiff; if, however, it is determined that the intervening cause was not foreseeable and that the results which it caused were not foreseeable, then the intervening cause becomes a supervening cause and the defendant is relieved from liability for the plaintiff's injuries. (Rest.2d Torts, § 440 et seq., p. 465; Witkin, *supra,* § 289, p. 1488, and cases cited therein.) In the instant case, for example, it could be argued that if plaintiff's parents were negligent in failing to exercise proper care for plaintiff's safety, their negligence constituted an intervening cause. Following this line of reasoning, it would be incumbent upon the jury to determine whether the negligence of plaintiff's parents was foreseeable to defendants, or, if not foresee-

able, whether it nevertheless resulted in a type of injury which was foreseeable to defendants.

## The "Sole Proximate Cause" Instruction

██ Based upon our conclusion that the question of the negligence of plaintiff's parents was properly injected into the instant case, we similarly conclude that the instruction which the trial court gave on "sole proximate cause" was proper. This instruction, which followed instructions requested by plaintiff defining "proximate cause" in terms of actual and legal cause,[8] told the jury that "if it appears from the evidence that the sole proximate cause of the accident and injury to the plaintiff was the negligence of the parents of the plaintiff Glen Ray Akins or of some third parties, that this would constitute a complete defense to the defendants," and was a proper instruction. In the light of all of the instructions on "proximate cause," the purport of the subject "sole proximate cause" instruction was that if the jury found that plaintiff's accident would have occurred even without negligence on the part of defendants, i.e., that the sole actual cause of the accident was the negligence of plaintiff's parents, then defendants would be relieved from liability, and that even if they found that defendants' conduct was an actual cause of plaintiff's injury, defendants would nevertheless be absolved if the jury found that the negligence

---

[8]These instructions were as follows:

"The proximate cause of an injury is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred. It is the efficient cause—the one that necessarily sets in operation the factors that accomplish the injury. (It may operate directly or through intermediate agencies or through conditions created by such agencies.)

"Liability in law attaches only to the proximate cause of injury. Although many circumstances leading up to and surrounding an accident may be linked to it in a chain of causation, so that we may say that the accident would not have happened without them, the proximate cause consists only of the factor or combination of factors that compels the injurious result.

"The word 'proximate' means 'near'; and any particular conduct, to be a proximate cause of injury, must be effective as a cause at the time the injury is inflicted, and in one of three ways: It must immediately precede and lead into the injury, or, if the conduct began or was done at a prior time, either it or a condition created by it must continue to the time of injury.

"This does not mean that the law seeks and recognizes only one proximate cause of an injury, consisting of only one factor, one act, one element of circumstance, or the conduct of only one person. To the contrary, the acts and omissions of two or more persons may work concurrently as the efficient cause of an injury, and in such a case, each of the participating acts or omissions is regarded in law as a proximate cause.

"To give rise to liability, however, any such proximate cause must have consisted of negligent conduct."

of the parents was a supervening intervening cause, i.e., an intervening cause which was neither foreseeable nor caused the type of injury which was foreseeable.

*Jury View*

 Near the conclusion of the trial plaintiff's counsel requested that the court allow the jury to view the premises and the bleachers from which plaintiff had fallen. The court denied the request on the grounds that photographs introduced into evidence adequately depicted the scene of the accident and that one of the jurors who had been injured during the course of trial would have difficulty climbing the bleacher stairs to view the actual scene of the accident. Whether to grant a request for a jury view of the premises lies within the discretion of the trial court (see Code Civ. Proc., § 610; *Nunneley* v. *Edgar Hotel* (1950) 36 Cal.2d 493, 501 [225 P.2d 497]; *Trust* v. *Arden Farms Co.* (1958) 50 Cal.2d 217, 225 [324 P.2d 583]), and contrary to plaintiff's contention no abuse of such discretion has been shown in this case.

No other contentions merit discussion. The judgment is affirmed.

Traynor, C. J., McComb, J., Schauer, J.,* and Draper, J. pro tem.,† concurred.

PETERS. J.—I dissent.

The holdings of the majority that the General Industry Safety Order set forth in section 3237 of title 8 of the Administrative Code has no application to the facts of this case and that the trial court properly refused to instruct the jury as to the legal effect of violations of the safety order, are clearly erroneous.

The majority state that, although "it is undisputed that county employees assembled, disassembled, maintained and repaired the bleachers, and stood on them to do so, it cannot be said that the bleachers were 'used by employees in the course of their employmnt' as that phrase is used in section 3223 to define a 'working level for persons.' The bleachers were designed to provide seating for spectators and not as a 'working level for persons.' " Therefore, say the majority, section 3237 is inapplicable.

This interpretation is clearly wrong. It completely ignores

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Assigned by the Chairman of the Judicial Council.

other language in the same section that makes it crystal clear that it applies to bleachers which according to the majority are ''designed to provide seating for spectators.'' The section expressly says so.

Section 3237 provides: ''(a) (NI) Platforms, runways, ramps or other elevated working levels four feet or more above floor, ground, or other working area shall be not less than two feet wide.

''(b) (SO) Platforms, runways, ramps, or other working levels four (4) feet or more above the floor, ground or other working areas shall be guarded by a railing on all open sides. Standard railing shall be provided where over-head clearance permits. The railings shall be provided with a toeboard where the platform, runway, or ramp is six (6) feet or more above places where employees may pass. . . .''

The section contains nine exceptions. Exception (6) states: ''Galleries, balconies or other elevated locations where seatings are arranged on platforms or successive tiers, may be protected by a substantial railing not less than 30 inches high which shall be placed at the front edge of the platform along the entire row of seats.''

Exception (7) states: ''Existing platforms, balconies and galleries in places of employment where the prime exposure is to members of the public rather than to employees may be equipped with 36-inch high railings equivalent in strength and design to standard railings.''

It is obvious that the purpose of exceptions (6) and (7) is to make exceptions to the standard rail heights which are 42 to 45 inches under section 3225, but the important thing to us here is that these exceptions show that the other provisions of section 3237 and its exceptions apply to bleachers where ''seatings are arranged on platforms or successive tiers'' and where the ''prime exposure is to members of the public rather than to employees.'' How clearer could the language be?

. The conclusion is inescapable that section 3237 was intended to apply to bleachers designed to provide seating for spectators, where the benches of the bleachers are used by employes in the course of their employment, whether or not the bleachers were designed for such use.

Section 3223, relied upon by the majority, is consistent with this view. The section merely states: ''Working level or working area means a platform, walkway, runway, floor or similar area fixed with reference to the hazard and used by employees in the course of their employment. This does not include

ladders or portable or temporary means used for access, repair or maintenance, provided such means are removed immediately upon completion of the work." A platform is defined as "an elevated working level for persons," by section 3215 which also provides that "balconies and open-sided floors are considered platforms for the purpose of these orders." As the majority point out, it is undisputed the county employees stood on the bleachers in assembling, repairing, and maintaining them. Further, the evidence shows that the seat board was only 9 inches wide, that on the open side or back there was no toeboard, that on the open side the distance to the floor exceeded six feet, and that the area behind and below the bleachers was used as a walkway.

Section 815.6 of the Government Code provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

The Law Revision Commission comment to this section states: "This section declares the familiar rule, applicable to both public entities and private persons, that failure to comply with applicable statutory or regulatory standards is negligence unless reasonable diligence has been exercised in an effort to comply with those standards. *Alarid* v. *Vanier*, 50 Cal.2d 617, 327 P.2d 897 (1958) (setting forth general rule); *Lehmann* v. *Los Angeles City Bd. of Educ.*, 154 Cal.App.2d 256, 316 P.2d 55 (1957) (applying rule to public entity). . . ." The latter case, which like the instant one involved safety regulations of the Division of Industrial Safety adopted pursuant to sections 6312 and 6500 of the Labor Code, held that such regulations are for the protection of the public as well as employees (*Porter* v. *Montgomery Ward & Co., Inc.*, 48 Cal.2d 846, 848 et seq. [313 P.2d 854]), and that it was error to refuse an instruction that violation of the regulations was prima facie evidence of negligence.

In the instant case plaintiff requested instructions on the presumption of negligence arising from the violation of safety orders and particularly on the provisions of section 3237 of title 8 of the Administrative Code. No claim is made that the form of the proffered instructions was improper, and the evidence is clearly sufficient to show a violation of section 3237. The width requirement of the platform is obviously to prevent

persons from falling.[1] The refusal of the offered instructions was clearly error. There is no conceivable basis for concluding that the erroneous refusal of instructions on the presumption of negligence was not prejudicial.

I would reverse the judgment.

Tobriner, J., concurred.

Appellant's petition for a rehearing was denied September 21, 1967. Schauer, J.,* and Draper, J. pro tem.,† sat in place of Mosk, J., and Sullivan, J., who deemed themselves disqualified. Peters, J., and Tobriner, J., were of the opinion that the petition should be granted.

---

[1]It might also be urged that the toeboard requirement is not only to protect persons below from injury due to falling objects but also to protect persons from falling. In any event, it was error to refuse the offered instruction.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Assigned by the Chairman of the Judicial Council.