**Herbert Marion THORNE, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 71–1457.**

United States Court of Appeals,
Ninth Circuit.

May 31, 1973.

R. Jay Engel (argued), San Francisco, Cal., for appellant.

Donald N. Stahl, Asst. U. S. Atty. (argued), Dwayne Keyes, U. S. Atty., Richard V. Boulger, Asst. U. S. Atty., Fresno, Cal., William J. Connolly, of Connolly, Johnson & Hothem, San Francisco, Cal., for appellee.

Before MERRILL, WRIGHT and KILKENNY, Circuit Judges.

KILKENNY, Circuit Judge:

This is an appeal from the dismissal of an action by appellant prosecuted under the Federal Torts Claims Act, 28 U.S.C. § 1346(b) and § 2674 in connection with personal injuries sustained by him in an accident which occurred in California on the construction site of a government dam. At the conclusion of appellant's case, the appellee's motion to dismiss was granted. We reverse.

## FACTS

The appellant was an employee of Guy F. Atkinson Construction Company [Contractor], which had contracted with the Department of the Interior, Bureau of Reclamation, of the United States [Bureau], to construct a spillway as part of the dam. The Bureau performed all of the preliminary surveying and geological studies on which it compiled a set of specifications and standards for the construction project. Appellant's duties required his presence in a trench which was one of a series of trenches being dug across the face of the dam's spillway. Commonly known as "toe trenches", they were designed to act as a foundation for the spillway which ran down hill on a steep slope in shale rock. The overall design called for the toe trenches to be filled with concrete on completion. The spillway and its supporting trenches were being constructed on the shale base, which had been extensively surveyed prior to the award of the contract. At the time of the accident, the toe trench in question was almost completed, having been dug to a depth of approximately three feet. At that point, and while appellant was digging in the trench, a large slab of shale rock broke loose on the upper side of the trench, slid downhill across the trench striking and injuring him.

The General Provisions of the contract for the construction of the dam, including the spillway, required the Contractor, at a minimum, to comply promptly with its own safety requirements and, in addition, required it to comply with the "Safety Requirements for Construction by Contract", as published by the Bureau. The published Safety Requirements referred to in the

contract made specific reference to procedures to be utilized when confronted with open excavations.[1]

Beyond that, the General Provisions required the Bureau to notify the Contractor, in writing of any non-compliance with the Safety Requirements of the published rules. For failure of the Contractor to comply with any such directive, the Contracting Officer was authorized to issue an order suspending all or part of the work until corrective action was taken.

That the agents of the Bureau in charge of supervising the construction recognized the danger of slides in excavating a trench on the steep slope is well established by the evidence. Prior to the award of the Contract, the Bureau, through its geological surveys, was fully aware of the shale rock to be encountered in the construction of the spillway and the digging of the trenches. Needless to say, that was the reason for the shoring requirements on the upside of the trench. The only logical purpose of the requirement for installation of the shoring above the toe trenches was to prevent slides, such as here occurred, and thus prevent injury to workmen and others who might be in or around the trench. The Bureau's supervising construction inspector discussed the danger with the labor foreman of the Contractor and directed him to place anchor bars above the trenches in order to prevent slippage. A supervisor for the Contractor was present at this discussion. The Bureau's knowledge of the danger encountered in trenching on the spillway in question is demonstrated by the testimony of Mr. Koehler, a Bureau construction supervisor, in his conversation with Mr. Ward, a supervisor for the Contractor.[3] The record shows that anchor bars were placed above the toe trench dug immediately previous to the one under scrutiny. Despite the specific safety requirements on open excavations in the Bureau's publication and the acknowledged recognition of the danger by both the Bureau and the Contractor, no anchor bars were put in place above the offending trench. It is undisputed that the trench was under excavation for a period of five days prior to the accident. During most of this time, a Bureau inspector was present. However, an inspector was not present at or near the trench on the day of the accident.

1. "Open Excavation

14–10. *Where danger of slides or cave-ins exist and workmen may be endangered, the sides shall be* sloped to a stable angle of repose, or *supported by sheet piling or adequate* shoring.

14–11. Men and equipment working below vertical cuts or steep slopes shall be protected from rock and falling objects in the following manner:

a. Proper scaling performed prior to exposure and at intervals necessary to eliminate the danger.

b. Roof bolting and wire mesh or equal protection afforded where the material continues to ravel and fall after careful scaling.

c. Protective timber or wire mesh barricades created at the top of the cut and at necessary vertical intervals down the slope.

d. Benching to catch and retain falling material. Utilization of any or all of the protective methods listed above shall be at the option of the Contracting Officer,[2] or his authorized representative, following inspection of the site." [Emphasis supplied.]

2. Official in charge for the Bureau.

3. * * * * *

"The Court: All right, tell us.

The Witness: Since these other slides occurred I took Mr. Ward and told him, we walked to this area, and I told him that he was going to have to do something to make this safe before he excavated the trench. We discussed the various means of shoring it and whatnot, and as there was nothing to kick shoring to except open air, we discussed grouting the anchor bars in place as a means of holding the shale. He agreed that that would be the thing to do, and that was the extent of the conversation. He said that he would grout these bars in place before he excavated this trench.

Mr. Engel: Q. Now, when you say this trench,[4] you mean the trench, at 6 plus 54, is that correct?

A. Yes, sir." [R.T., page 73].

* * * * *

4. Trench in which appellant was injured.

The undisputed evidence, including a dramatic photograph of the trench in question, demonstrates beyond a reasonable doubt that the excavation of the particular trench across the face of the steep spillway was a highly dangerous operation. It is unquestioned that the Bureau, through the testimony of its own supervisors, its surveys and the requirements of its own Safety Rules, recognized the dangerous character of the trenching operation.

Without reference to the dangerous type of work in which appellant was employed, or the applicability of the California state law to the facts, the trial judge treated the Bureau's motion for dismissal, at the close of appellant's case,[5] as a motion for judgment in favor of the defense and allowed the motion with the terse statement: " . . . I'm of the view that plaintiff has not established the requisite facts to establish liability on the part of either defendant[6] in this case. . . ." The findings and conclusions prepared by counsel for the Bureau and signed by the judge are no more enlightening as to the law which he applied to what we must consider as the undisputed facts, drawing therefrom all inferences favorable to appellant. With this background before us, we proceed to explore the applicable law.

## BUREAU'S DUTY UNDER TORTS CLAIMS ACT

The applicable provisions of the Federal Torts Claims Act[7] makes the United States [Bureau] liable for personal injuries caused by the negligent or wrongful acts or omissions of an employee of the Bureau while acting within the scope of his office or employment under any and all circumstances where the Bureau, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

■ Here, the accident occurred in California. Consequently, California law governs in determining whether a private person, and, therefore, the Bureau, should be liable on the record before us.

## CALIFORNIA LAW

The one case to which our attention has been directed and the only one our research has revealed, which is almost exactly in point on the application of state law to the factual background before us is Emelwon, Inc. v. United States, 391 F.2d 9 (CA5 1968), cert. denied 393 U.S. 841, 89 S.Ct. 119, 21 L.Ed.2d 111. There, as here, the appellants sought recovery under the Federal Torts Claims Act for damages to their growing crops, in connection with a spraying operation. The district court directed a verdict for the United States on the ground that the state of Florida, which carried on the spraying operations causing the damage, was neither an agent nor an employee of the United States, but was an independent contractor. In reversing the judgment, the Fifth Circuit recognized that the United States could not be held liable without fault and that the doctrine of strict liability did not apply, citing among others, Dalehite v. United States, 346 U.S. 15,

---

5. Issue of liability only.

6. The Contractor was joined under a third-party complaint filed by the Bureau.

7. 28 U.S.C. § 1346.
   "(b) . . . for money damages, . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."
   * * * * *
   28 U.S.C. § 2674.
   "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances; . . . ."

44–45, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), and also recognized that under ordinary circumstances the United States could not be held liable for the negligence of an independent contractor. After acknowledging these rules, the court then went on to hold that there were at least two applicable theories of Florida law under which the United States would be liable. First, the Florida rule that the owner or employer may incur liability through its failure to halt an operation when it gains knowledge of a dangerous situation, which might be created by an independent contractor. Second, the Florida rule that one who employs an independent contractor to engage in certain types of dangerous activity has a "non-delegable duty" and must see to it that the independent contractor carries out his task in a nonnegligent manner. On the second point, the court went on to say that the employer's liability was not absolute, nor was he held vicariously liable for the negligence of the independent contractor. Instead, liability was imposed on the employer for his own failure to exercise reasonable care in a situation in which the work is sufficiently dangerous that the employer himself has a duty to third persons who may sustain injuries from the work unless proper precautions are taken. The court then went on to hold that the spraying of herbicides or insecticides was an activity which was sufficiently dangerous to warrant the application of the Florida non-delegable duty rule.

A perusal of the California authorities convinces us that the law of that state is essentially the same as the Florida law before the Court in *Emelwon, Inc., supra.*

Before we discuss the specific California cases, it is well to recognize that its courts have followed the proposition that one who employs an independent contractor is, as a general rule, not liable for the misconduct of the latter or his servants while acting within the scope of the contract. The idea responsible for this general rule of non-liability is the want of control and authority of the employer over the work, and the consequent harshness of the rule which would hold one responsible for the manner of conducting an enterprise over which he lacks the authority to direct the operations. However, the court recognizes that there are certain clear cut exceptions which, with increasing tendency, seem to overshadow in importance and scope the rule itself.

At least one of these exceptions is here of importance. It is the duty imposed on an employer of an independent contractor for the misconduct of the latter in the performance of certain "intrinsically dangerous" work. The policy of allocating to the owner or employer the risk incident to his activity is obvious when the activity carries with it extraordinary hazards to third persons. This duty is recognized as California law in the exhaustive opinion of Justice Peters in Van Arsdale v. Hollinger, 68 Cal.2d 245, 66 Cal.Rptr. 20, 437 P.2d 508 (Cal.1968), a case comparable to the one before us. In *Van Arsdale*, an employee of a street improvement contractor was eradicating markings on a busy street. The City of Los Angeles and the contractor recognized that the street improvement work involved special hazards to the public and to the employees of the contractor. By the terms of the agreement, the contractor was required to provide flagmen, wearing red coats and carrying a red hat or sign. When plaintiff was injured, no flagmen were working and the plaintiff, the injured employee of the contractor, was not wearing a red or orange jacket. There, the court imposed liability on the City for its failure to exercise care in a situation in which the work was sufficiently dangerous that it had a duty to others who might sustain injuries from the work unless proper precautions were taken in the performance thereof. It went on to hold that the taking of such precautions was a duty which the city could not delegate to its independent contractor so as to evade liability. Under California law, the Bureau, in this case, was under a duty to exercise reasonable care to see

that proper precautions were taken by the contractor. On the record before us, no such precautions were taken.

■ While generally speaking, the mere reservation of a right to inspect work performed by an independent contractor, including the right to stop the work if precautions are not taken, does not impose upon the government any duty of inspection or control, Roberson v. United States, 382 F.2d 714 (CA9 1967), this rule does not apply to a factual background, such as this, where the work is extra-dangerous. Although an extra-dangerous condition may have been involved in *Roberson*, the court refused to consider this problem for the reason that the issue had not been raised in the lower court. P. 718.

Since we perceive of no significant distinction between the non-delegable duties of an owner in his contract relationship with an independent contractor, and the same duties in the relationship between an independent contractor and his subcontractor, we think the following cases are also in point on the California law to be applied to the record here presented, to wit: Kirk v. Kemp Bros., 12 Cal.App.3d 136, 90 Cal.Rptr. 553 (1970); Anderson v. L. C. Smith Construction Co., 276 Cal.App.2d 436, 81 Cal.Rptr. 73 (1969).

The Bureau attempts to distinguish between the facts in *Van Arsdale* and the facts before us on the ground that prior to the beginning of the work the government had no warning that "particular risk of physical harm" would arise. This argument is foreclosed by the record. The government's plans and specifications under which the contract was let required the digging of this and other trenches across the face of a steep slope, which the government knew from it own surveys would be cut through shale rock. Beyond that, the government supervisors in charge were fully aware of the dangerous character of the work. Cases such as McDonald v. Shell Oil Co., 44 Cal.2d 785, 285 P.2d 902 (1955) and Anderson v. L. C. Smith

Construction Co., *supra,* cited by Bureau, did not involve highly dangerous work, known to be such by the owner. In attempting to reconcile Emelwon, Inc. v. United States, *supra,* the Bureau completely misses the effect of that decision. Without citing authority, it makes a simple statement that the non-delegable duty asserted by appellant is not applicable to the United States under the Torts Claims Act. The argument completely ignores the California law on the subject and the fact that the Bureau had previous knowledge of the highly dangerous nature of the work and that its plans required the construction of the dangerous trenches. At least two of its supervisors were fully aware of the dangerous character of the work. The many cases cited by Bureau on sovereign immunity have no application. The Torts Claims Act, under which appellant is proceeding, waived this immunity to the extent of the provisions of the Act.

The Bureau's reliance on United States v. Page, 350 F.2d 28 (CA10 1965), is also misplaced. A casual reading of the case reveals that the facts did not present a situation where the employees of the United States and the United States itself had actual knowledge of the dangerous nature of the work. Beyond that, the court did not directly pass on the problem before us. We quote from the opinion: "The general law on the subject casts serious doubts on whether the doctrine of non-delegable duty, as here involved, applies to injuries to employees of the independent contractor." P. 33. The court then went on to express the view that the Supreme Court of Utah would probably follow the rule as stated. *Van Arsdale* and other California cases demonstrate that the alleged Utah rule is not followed in California.

■ Appellee's argument on failure to introduce evidence on the proximate cause of appellant's injuries is groundless. The shale slide caused the injury. Lack of proper precautions, recognized by the Contractor and the Bureau, re-

sulted in the slide. The failure of the Bureau to insist on the necessary precautions was a cause. It need not be the only cause. Adkins v. County of Sonoma, 67 Cal.2d 185, 60 Cal.Rptr. 499, 430 P.2d 57 (1967).

■ The recent case of Jeffries v. United States, 477 F.2d 52 (CA9, 1973), is distinguishable. There, the author of the opinion expressed some doubt as to "whether the 'non-delegable duty' theory is available under the Federal Torts Claims Act." P. 57. It is clear that the court's doubt was directed to the question whether the non-delegable duty theory would apply where the result would be to impose vicarious liability upon the United States for negligence of the contractor. The same is true of United States v. DeCamp, 478 F.2d 1188 (CA9, 1973). There, the majority held that there was no negligence on the part of either the contractor or the government. Here, both were negligent.

## CONCLUSION

It is our considered judgment that the Bureau should have recognized that the construction of the trench across the face of the shale side hill, under the terms of the contract, would involve a peculiar risk of bodily harm to others unless special precautions were taken. Under California law, the Bureau had a non-delegable duty to exercise reasonable care, including the duty to see to it that the Contractor exercised such care. On these facts, the findings and conclusions of the trial judge are clearly erroneous.

## REMAND

The judgment of dismissal was allowed at the close of appellant's case on the issue of liability. That judgment is set aside and the cause remanded to the lower court for a new trial, in which trial the court will apply to the facts the California law as above stated.

It is so ordered.

MERRILL, Circuit Judge (concurring):

I concur in the opinion of Judge Kilkenny. I should only like to emphasize that while the phrase "non-delegable duty" may conjure up visions of vicarious liability beyond the scope of the Tort Claims Act, the duty here owed by the Bureau, as stated by Judge Kilkenny, was to exercise reasonable care to see that proper precautions were taken by the contractor. It was breach of this duty by employees of the Bureau that results in liability of the United States.

California law may, as the Government contends, impose upon the state liability greater than that imposed on the United States by the Tort Claims Act. If so, that excess of liability need not concern us here.