773 F.2d 1050
 Jesus BORQUEZ, as surviving parent of Jose Edwardo Borquez,
on his own behalf and on behalf of his wife, Anna Maria
Duron Borquez; Arthur T. Dahlin, as surviving parent of
Jonathan "Duke" Dahlin, on his own behalf and on behalf of
his wife, Jessalee C. Dahlin; Zane Dahlin, a single man,
Plaintiffs- Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 83-2418.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 15, 1984.
Decided Oct. 10, 1985.
 
 Paul G. Rees, Jr., Tucson, Ariz., for plaintiffs-appellants.
 William H. Swan, Phoenix, Ariz., for defendant-appellee.
 Appeal from a Judgment of the United States District Court for the District of Arizona.
 Before MERRILL, FLETCHER and CANBY, Circuit Judges.
 MERRILL, Circuit Judge:
 
 
 1
 * The Salt River Project (SRP) is a large Arizona irrigation project, designed and constructed by the Bureau of Reclamation (Bureau), an agency of the Department of the Interior.
 
 
 2
 The Salt River Valley Water Users Association (Association) was created in 1903 as a state corporation for the purpose of dealing with the United States respecting the creation of SRP. In 1904, pursuant to an agreement between the United States and the Association, the United States agreed to construct the project and the Association agreed to repay the costs of construction. The Bureau was given the responsibility for designing and constructing the project and proceeded to do so. The Power Canal Diversion Dam was a component of the project. In a contract dated September 6, 1917, the federal government transferred the care, operation and maintenance of the project to the Association. The contract further provided that the Association would hold the United States harmless from any damages to property arising out of the care, operation and maintenance of the project. The contract allowed the United States certain inspection rights and provided for termination upon notice by either the United States or the Association.
 
 
 3
 On November 26, 1935, another contract was signed by the Secretary of the Interior and the Association for repairing and improving the project. This contract also provided that the Association assume the care, operation and maintenance of the improvements and that the Association hold the United States harmless for any injury or damages to persons or property arising out of the care, operation and maintenance of the project. The right to inspect was again reserved by the United States.
 
 
 4
 The Salt River Project Agricultural Improvement and Power District (District) was formed in 1937. In an agreement reached with the Association, the Association made the District its contracting agent and transferred to the District all its property. The Association in turn agreed to continue to maintain and operate the SRP.
 
 
 5
 By the 1950's, use of the diversion dam had been completely discontinued. No formal action was taken, however, by the Association or the District to return possession, control or operation and maintenance of the dam to the federal government or to terminate the 1917 or 1935 contracts.
 
 
 6
 The land under and surrounding the diversion dam is owned by the United States. The surrounding land is managed by the Tonto National Forest, a component of the United States Forest Service. The Forest Service is an agency of the Department of Agriculture.
 
 
 7
 On April 13, 1979, Jose Borquez and Jonathan Dahlin were drowned and Zane Dahlin was injured at the diversion dam when they attempted to walk across the top of the dam. Zane Dahlin and the survivors of the other boys brought suit against the United States under the Federal Tort Claims Act. The district court rendered summary judgment in favor of the United States and appellants have taken this appeal under 28 U.S.C. Sec. 1291. They contend that the district court erred in refusing to recognize their claims for injury and wrongful death. They allege that the federal government was liable for (1) the construction of the dam with a defective design; (2) the negligent care, operation and maintenance of the facility; and (3) the failure to warn of the dangerous nature of the project.
 
 II
 
 8
 The Federal Tort Claims Act authorizes suits against the United States for damages "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. Sec. 1346(b).
 
 
 9
 The Act does not, however, entirely waive the sovereign immunity of the United States. The federal government may only be held liable for damages caused by the negligent or wrongful act or omission of a government employee. 28 U.S.C. Sec. 1346(b); Logue v. United States, 412 U.S. 521, 525-26, 93 S.Ct. 2215, 2218, 37 L.Ed.2d 121 (1973). Suits against the government arising in strict or absolute liability for ultrahazardous activities are not actionable. Laird v. Nelms, 406 U.S. 797, 799, 803, 92 S.Ct. 1899, 1900, 1902, 32 L.Ed.2d 499, reh'g denied, 409 U.S. 902, 93 S.Ct. 95, 34 L.Ed.2d 165 (1972); Dalehite v. United States, 346 U.S. 15, 44-45, 73 S.Ct. 956, 972, 97 L.Ed. 1427 (1953); Thompson v. United States, 592 F.2d 1104, 1107 (9th Cir.1979).
 
 III
 
 10
 With reference to the construction and design of the dam, appellants have failed to adduce any evidence that due care was not used. The government has, however, presented evidence that the dam was correctly designed for its purpose. Summary judgment in favor of the appellee was, therefore, proper as to this issue.
 
 
 11
 As to negligence alleged in the care, maintenance and operation of the project, these matters were transferred to the Association by the United States in the 1917 and 1935 contracts. The contracts were executed pursuant to 43 U.S.C. Sec. 499. Section 499 states:
 
 
 12
 Whenever any legally organized water-user's association or irrigation district shall so request, the Secretary of the Interior is authorized, in his discretion, to transfer to such water-users' association or irrigation district the care, operation, and maintenance of all or any part of the project works, subject to such rules and regulations as he may prescribe.
 
 
 13
 Appellants have failed to adduce facts sufficient to challenge this transfer. The 1917 and 1935 contracts did not reserve to the government any ultimate duties over care, operation and maintenance. These agreements granted the United States no more than the right to inspect the project and terminate the agreements. The agreements were never terminated.[1] Indeed, the government obtained hold-harmless agreements from the Association.
 
 
 14
 Liability for duties delegated pursuant to statute is forbidden. Among the classes of claims exempted from the Tort Claims Act is
 
 
 15
 [a]ny claim based upon an act or omission of any employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid.... 28 U.S.C. Sec. 2680(a).
 
 
 16
 The purpose of this provision is to bar "tests by tort action of the legality of statutes and regulations." Dalehite, 346 U.S. at 33, 73 S.Ct. at 966. No evidence has been introduced which indicates that due care was not used in the transfer to the Association. The failure by the government to erect barricades or to post warnings is not, therefore, actionable, because a lawsuit concerning these omissions would represent a challenge to the statutory authority of the government to transfer full care, operation and maintenance.[2]
 
 IV
 
 17
 The government, having validly transferred operation, care and maintenance, is also not liable for any acts or omissions of the Association. The liability of the United States extends only to the negligence of employees. 28 U.S.C. Secs. 1346(b), 2671; United States v. Orleans, 425 U.S. 807, 814, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976). A contracting party is an employee if, unlike the Association, it is subject to day to day supervision. See Orleans, 425 U.S. at 815, 96 S.Ct. at 1976. That a contracting party is maintaining property owned by the federal government is irrelevant to employee status. See Thompson, 592 F.2d at 1107.
 
 V
 
 18
 Because liability for properly delegated duties is forbidden under the Tort Claims Act, any tort liability of the United States must reside in some non-delegable duty under Arizona law. This court has previously recognized, under California and Nevada law, the existence of a non-delegable duty to exercise reasonable care in seeing that inherently dangerous work, which an independent contractor has agreed to perform, is performed in a non-negligent manner. See Rooney v. United States, 634 F.2d 1238, 1244 (9th Cir.1980); McGarry v. United States, 549 F.2d 587, 590 (9th Cir.1976), cert. denied, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977); Thorne v. United States, 479 F.2d 804, 808 (9th Cir.1973). In this case, the injuries did not arise from any special dangers inherent in the actual maintenance or operation of the dam for the purpose for which it was intended. Cf., Rooney, 634 F.2d at 1240, 1244 (employee injured in fall while painting a fifty-five foot high radome); McGarry, 549 F.2d at 589-90 (employee electrocuted while preparing to drill an exploratory hole); Thorne, 479 F.2d at 805 (employee injured in construction of a dam spillway). Even if the care, maintenance and operation of the dam assumed by the Association were construed to include a duty to warn the public away from the dam, such warnings, if given, would permit the dam to be operated safely. The operation of the dam cannot then be viewed as "inherently dangerous" for purposes of rendering the United States liable, because it does not involve "a risk of harm which cannot be eliminated by the exercise of reasonable care." Bible v. First National Bank of Rawlins, 21 Ariz.App. 54, 57, 515 P.2d 351, 354 (1973).
 
 
 19
 Judgment affirmed.
 
 FLETCHER, Circuit Judge, dissenting:
 
 20
 I respectfully dissent.
 
 
 21
 The Association and the Forest Service shared responsibility for managing the Roosevelt Power Canal Diversion Dam, where the drowning incident occurred. The Association was responsible for operating the dam for irrigation and power generation purposes, while the Forest Service administered the area around and including the dam as a recreational area within Tonto National Forest. I conclude that because of the Forest Service's management activities, the United States had a duty to warn recreational visitors to the dam area concerning the potential dangers associated with the diversion dam.
 
 
 22
 The 1935 contract between the Association and the United States provided that:
 
 
 23
 ... the Association shall at its own cost and without expense to the United States care for, operate and maintain the [reclamation works constructed by the United States] in such manner that such works shall remain in as good and efficient condition and of equal capacity for storage, diversion, transportation, and distribution of water as when received from the United States, reasonable wear and damage by the elements excepted. After the care, operation and maintenance of the aforesaid works have been assumed by the Association, the Association shall [hold] the United States, its officers, agents and employees harmless as to any and all injury and damage to persons and property which may arise out of the care, operation and maintenance thereof.
 
 
 24
 The text of this agreement is at best ambiguous. Under its terms, the Association assumed responsibility for operating the SRP for irrigation and power generation purposes, and assumed liability for any damages resulting from its operation as an irrigation and power project. The Association did not expressly assume responsibility or liability for the SRP's use as a recreational facility within Tonto National Forest.
 
 
 25
 In 1948, the United States Bureau of Reclamation, which had contracted with the Association regarding operation of the SRP as an irrigation and power project, entered into a Memorandum of Understanding with the United States Forest Service "Pertaining to the Development and Administration of Recreational Facilities at Bureau of Reclamation Reservoirs that are Wholly or Substantially Within the Boundaries of National Forests." The two agencies agreed that:
 
 
 26
 On areas within national forests withdrawn for reclamation purposes, but not in actual use in connection with reclamation works, the [Forest] Service will administer the lands as ordinary national forest lands.... The Service will consult with the Bureau in regard to general management policy, as reflected by issuance of permits or contracts, utilization of resources, or improvements, in order that no practice that might lead to interference with reclamation purposes may be introduced into the withdrawn areas.
 
 
 27
 Although it does not address this 1948 memorandum, the majority recognizes that the Roosevelt Diversion Dam has not been used for irrigation or power generation purposes since the early 1950s. Since the dam is completely contained within Tonto National Forest, under the 1948 memorandum the Forest Service has been responsible for over thirty years for managing and administering the area around the dam for recreational purposes.
 
 
 28
 Not only has the Forest Service had this responsibility in theory, but it has in practice exercised jurisdiction over and managed the area immediately around the diversion dam for recreational purposes. Forest Service officials testified that at the time of the drowning incident, forest rangers patrolled the area at least once per week. The Forest Service maintained signs on the banks of the river adjacent to the dam requesting recreational users to remove their garbage and cautioning them to prevent forest fires. The Service had issued a permit authorizing a marina concession within three miles of the dam. The Deputy Forest Supervisor for Tonto National Forest even testified that the area immediately around the dam was then and still is "just like the rest of the national forest."
 
 
 29
 The record belies any contention by the Forest Service or the United States that the area surrounding the diversion dam is somehow segregated from the rest of Tonto National Forest: it indicates that those managing and visiting the National Forest have regarded the dam and Forest lands around it as a single, integrated recreational area. There are dirt roads running for several hundred feet through Forest lands that connect the highway with the edge of the dam. There are no signs or barricades blocking access to the area immediately surrounding the dam. There is a small convenience store about one-quarter mile from the dam that sells bait and tackle and other goods needed for recreational users. The Deputy Forest Supervisor acknowledged that the Service knew prior to the drowning incident that visitors to the National Forest used the area around the dam extensively for swimming, boating, rafting, fishing, and camping. The signs concerning garbage removal confirm that the Service knew there was significant use of the area. The record suggests that for the most part, individuals did not visit the Forest lands surrounding the dam except as a means of reaching the dam and the water around it.
 
 
 30
 In sum, the Forest Service exercised jurisdiction and management authority over the area around the diversion dam, and through its ranger patrols and signs, led the public to believe that it was managing the area and, presumably, was taking measures to ensure the safety of recreational users. The United States should not be permitted to avoid liability now by denying that the Forest Service had any involvement in the area.
 
 
 31
 I would find that the drowning victims were public invitees under Arizona law. See Restatement (Second) of Torts Sec. 332(2) & comment d (1965) (defining "public invitee");[1] Trowell v. United States, 526 F.Supp. 1009, 1012-13 (M.D.Fla.1981) (woman injured in national forest recreation area is public invitee). They did not exceed the "scope of [their] invitation" by entering the area surrounding the dam for recreational purposes. See Nicoletti v. Westcor, Inc., 131 Ariz. 140, 639 P.2d 330, 333 (1982); Restatement (Second) of Torts Sec. 332 comment 1 (defining "scope of invitation" and explaining that "[a] visitor has the status of an invitee only while he is on the part of the land ... upon which the possessor gives him reason to believe that his presence is desired for the purpose for which he has come.").
 
 
 32
 Since the victims were invitees, the United States had a duty under Arizona law to inspect the area around the dam in order to discover possible dangerous conditions, and to warn them about latent dangerous conditions, such as the whirlpool effect that existed near the dam at high-water levels. See Heth v. Del Webb's Highway Inn, 102 Ariz. 330, 429 P.2d 442, 445 (1967); Martinez v. Lucky Stores, Inc., 18 Ariz.App. 412, 502 P.2d 1089, 1090 n. 1 (1972); see also Bisnett v. Mowder, 114 Ariz. 213, 560 P.2d 68, 69 (Ariz.App.1977) (duties owed to licensees); Restatement (Second) of Torts Sec. 343. Even if some of the dangers associated with the dam were obvious to those visiting it, the Forest Service, as a governmental agency, had a heightened duty to anticipate potential harm, even from obvious dangers, that might befall persons using the area for recreational purposes. See Restatement (Second) of Torts Sec. 343A & comment g (noting that "[t]here is ... a special reason for the possessor to anticipate [potential] harm where the possessor is ... the government, or a government agency, which maintains land upon which the public are invited and entitled to enter as a matter of public right," since when using public land, the public "may reasonably [be] expect[ed] ... to proceed to encounter some known or obvious dangers which are not unduly extreme, rather than to forego the right [to use those lands].").
 
 
 33
 The Forest Service certainly had the opportunity to warn recreational users concerning the dangers associated with the dam: it placed signs on the riverbanks beside the dam instructing visitors to remove their garbage and prevent forest fires, and could just as easily have placed signs there warning them about the dangers in the water surrounding the dam. Yet the record reveals that while the Forest Service provided the means and opportunity for individuals like the victims to visit the dam area, and perhaps lulled them into a false sense of security by leading them to believe that it had inspected and approved the area, it failed to identify or warn them about the potential dangers associated with the dam.
 
 
 34
 If the government knew or reasonably should have known about the whirlpool effect in the water around the dam, it had a duty to warn individuals like the victims who visited the dam area. I conclude that the district court erred in granting the United States's motion for summary judgment, and in denying the appellants an opportunity to present their claims to a jury. I would reverse the district court's decision.
 
 
 
 [1]
 The dissent relies upon a national 1948 agreement between several agencies of the federal government that provides for Forest Service administration of "lands in a reclamation withdrawal which are not in actual use in connection with reclamation works." In our view, that language refers to administration of land not yet used for reclamation structures. Once the diversion dam was built, the land used in connection with that dam was in actual use and the Forest Service's duty to administer it ceased. The land continues to be actually used by the diversion dam, whether or not the diversion dam continues to be in active use
 
 
 [2]
 We do not reach the question of whether, absent the bar imposed by 28 U.S.C. Sec. 2680(a), the government would have had any duty under Arizona law as a landowner or builder either to maintain the premises in a safe condition or to warn of a dangerous condition. See Morris v. United States, 521 F.2d 872, 874 (9th Cir.1975) (If a tort claim falls within an exception delineated in 28 U.S.C. Sec. 2680, the court lacks subject matter jurisdiction)
 
 
 [1]
 The Arizona courts have indicated that in the absence of state authority to the contrary, they will apply the principles of the Restatement (Second) of Torts. MacNeil v. Perkins, 84 Ariz. 74, 324 P.2d 211, 215 (1958); Fendler v. Phoenix Newspapers, Inc., 130 Ariz. 475, 636 P.2d 1257, 1260 (Ariz.Ct.App.1981); Barnum v. Rural Fire Protection Co., 24 Ariz.App. 233, 537 P.2d 618, 623 (1975)