Harriet McGARRY, Individually, and as guardian ad litem of Dennis McGarry, a minor, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

Patricia McGarry SCHELL, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

Nos. 74–1503, 74–1504.

United States Court of Appeals, Ninth Circuit.

Dec. 6, 1976.

Rehearing and Rehearing En Banc Denied March 21, 1977.

Thomas G. Wilson, Atty. (argued), of Dept. of Justice, Washington, D. C., for defendant-appellant.

John Squire Drendel (argued), of Bradley & Drendel, Ltd., Reno, Nev., for plaintiffs-appellees.

Before MERRILL and KENNEDY, Circuit Judges, and BURNS,* District Judge.

MERRILL, Circuit Judge:

The United States appeals from adverse judgments under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 et seq., granting to the surviving wife and children damages for the wrongful death of an employee of an independent contractor which occurred December 10, 1969.

For use by the Atomic Energy Commission (AEC) the United States has withdrawn from the public domain a large area in the State of Nevada, northwest of Las Vegas, designated as the Nevada Test Site (NTS) and utilized by the Commission as an outdoor laboratory. The Commission does not carry out experiments itself, but contracts for such work with research and development organizations known as scientific users. The Commission does not involve itself in the details of any research program but approves the program objectives only in a general sense. When a scientific user desires to perform an experiment, it sends a "criteria letter" describing the experiment to the NTS Support Office. If funds are available and the experiment is within the program scope the NTS Support Office authorizes other contractors to perform the necessary work. One such contractor was Reynolds Electrical & Engineering Co. (REECO), employer of the decedent Thomas McGarry.

Under its contract with AEC, REECO was to manage, operate and maintain the NTS. The contract provided:

"The Contractor shall take all reasonable precautions in the performance of the work under this Contract to protect the health and safety of employees and of members of the public and to minimize danger from all hazards to life and property, and shall comply with all health, safety, and fire protection regulations and requirements (including reporting requirements) of the Commission. In the event that the Contractor fails to comply with said regulations or requirements of the Commission, the Contracting Officer may, without prejudice to any other legal or contractual rights of the Commission, issue an order stopping all or any part of the work; thereafter a start order for resumption of work may be issued at the discretion of the Contracting Officer."

Elsewhere it provided:

"The Commission shall have the right to inspect the work and activities of the Contractor under this contract at such time and in such manner as it shall deem appropriate."

Elsewhere it is further provided:

"Persons employed by the Contractor shall be and remain employees of the Contractor, and shall not be deemed employees of the Commission or the Government * * *."

Because the AEC carries out its functions primarily through independent contractors, it employs only a small number of persons at NTS. Thus, while there were approximately 7,000 contractors' employees at NTS at the time of the accident, the AEC had only about 30 persons employed there. Of this number the AEC had only four employees located at NTS whose duties were primarily concerned with safety. The function of those individuals was to appraise a contractor's performance relating to safety practices. This was not a day-by-day appraisal of the contractor on a job, but rather a review of a contractor's safety activities program.

By contrast, since the safety responsibility is contractually assigned to the various contractors, REECO has a substantial safety department. At the time of the accident it had approximately 18–20 employees engaged in safety work. Unlike the AEC, which had no safety inspectors whose concern was with observation and monitoring, REECO did employ safety inspectors as well as safety engineers, whose concern was

---

* Honorable James M. Burns, United States District Judge for the District of Oregon, sitting by designation.

with the application of safety technology to the total operation.

The incidents resulting in the alleged wrongful death began when a criteria letter was submitted by one of the scientific users of NTS, Lawrence Radiation Laboratories, containing a proposal for drilling of exploratory holes to ascertain geology. Approval to proceed was given, including the drilling of one of the holes, and the location of that hole was established by the survey. It was in the vicinity of a power line owned by the United States but under the operational control of REECO. It was REECO's responsibility at that point to drill the hole. This entailed the preliminary drilling of anchor holes to accommodate tie-wires for the support of the drilling rig at the exploratory hole. For that purpose a truck known as a portadrill was driven to the site. It carried a drilling rig which could be folded horizontally over the truck. The driver of the truck was McGarry. The AEC safety office had received no notification as to the drilling of the exploratory holes.

After arriving at the site McGarry and a fellow-employer, Dasher, marked the position of four anchor holes. McGarry then raised the drilling rig into an upright position in order to insert the bit. With this mast extending over 30 feet in the air, McGarry drove the rig toward the first hole with Dasher walking in front to locate the site precisely. After they had gone a short distance Dasher heard a noise and saw oil running from the hydraulic engine and sparks flying from the left rear tire. He stopped McGarry, who alighted from the rig. They discussed the matter briefly and Dasher went to the left rear tire and put his hand on the tire. The tire felt hot and Dasher received a slight shock. Following further discussion, they went to the center of the rig, where, when McGarry leaned over to look at the hydraulic unit, he apparently touched the rig and was electrocuted. As Dasher was pulling McGarry away, he happened to look up and, for the first time, became aware of the electric lines which were touching the upraised mast.

The NTS electrical system provided circuit breakers which immediately de-energized the line when contact was made by the upright mast. The system also provided for three automatic reclosures of the de-energized circuit: instantaneously after the first de-energizing contact, again after fifteen seconds, and again after an additional thirty seconds. In each case of reclosure, since the mast remained in contact with the wire, the line was again de-energized in one-tenth of a second.

In addition to the automatic reclosures the line could be manually reclosed by the power dispatcher at an NTS dispatch office owned by the United States and operated by REECO. On this occasion the dispatcher noticed the voltage dip and, after the three automatic reclosures had been unsuccessful, he tested the circuit by manually closing it. As with the automatic reclosures, the manual closure did not hold for more than one-tenth of a second. The line thereafter remained de-energized until the drilling rig was removed.

It is thus apparent that when the rig made contact with the line, the line was automatically de-energized and remained in that condition except for four periods of reclosure, each of one-tenth of a second in length. Electrocution must have resulted from contact made by McGarry during one of those periods.

The dispatcher had not been notified that anyone was working in the area, although the AEC manual incorporated the Corps of Engineers' safety rule that operations adjacent to overhead lines should not be initiated until appropriate authorities had been notified. Had the dispatcher been advised of the presence of workmen in the area he could have de-energized the line, or he could have disconnected the automatic reclosure device and refrained from reclosing the line manually.

The administrative claims of McGarry's widow and two children were denied and they then brought these suits to recover damages for his death. After trial to the court without jury, an opinion was filed which also constituted findings of fact and

conclusions of law. Judgment was rendered in favor of the plaintiffs. 370 F.Supp. 525 (D.Nev.1973). This appeal was taken by the United States.

*Duty of Care Owing by United States*

■ The district court found that REECO had been guilty of negligence (among other acts and omissions) in failing to give notice to its power dispatcher of the fact that work was to be done in the neighborhood of the power line so that the line could be de-energized or at least prevented from reclosure in the event contact was made.

The AEC contends that the government cannot, under the Tort Claims Act, be held liable for injuries resulting from the negligence of REECO, its independent contractor, since under that Act the United States has waived immunity only in cases where injury results from negligence of a government employee.[1]

In *Thorne v. United States,* 479 F.2d 804 (9th Cir. 1973), this court determined that under California law, when an independent contractor is employed to engage in work that is extra dangerous,[2] the employer of the contractor has a duty to exercise reasonable care to see that the contractor takes proper precautions to protect those who might sustain injury from the work. We there held that since under California law such a duty was imposed upon a private person, it was imposed upon the United States under the Tort Claims Act. We noted that liability for breach of such duty is neither strict nor vicarious liability. It is not liability for the contractor's failure to exercise due care or to employ proper safety precautions. It stems from the duty of the contractor's employer to exercise reasonable care to see that the contractor abides by his responsibilities in that respect.

It was breach of that duty by the employees of the government (and not the negligence on the part of the employees of the contractor) that created liability in the United States in the *Thorne* case.

Here the governing tort law is that of the State of Nevada. Although the courts of that state apparently have not had occasion to consider the duty of care owing by the employer of a contractor under these circumstances, the district court in its opinion held:

> "It is the considered judgment of this Court that the Nevada state courts would give deference to the decisions of the California Supreme Court as interpreted in *Thorne v. United States* * * *."

370 F.Supp. at 564. The court also ruled that the duty existed in the situation here, where drilling equipment was to be used in the vicinity of dangerous transmission lines. The court concluded:

> "Under Nevada law, the AEC, in this case, was under a duty to exercise reasonable care to see that proper precautions were taken by the contractor."

*Id.* at 565.

We find no error in imposing this duty of care under the circumstances of this case. The power line was owned by the United States. It was to be contemplated that contractors would engage in work in its neighborhood, and the AEC here was aware of the location of the exploratory hole. In our judgment where a contractor is employed to perform work of a sort that may bring the worker into contact with a power line, the work is extra dangerous and the *Thorne* holding is applicable.

This need not as matter of law entail presence of an AEC inspector on each occasion of work performed in the neighborhood of the power line. If, here, the AEC had

---

1. 28 U.S.C. § 1346(b) confers jurisdiction on the district courts over civil actions on claims against the United States for money damages for injury or death "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

2. In *Van Arsdale v. Hollinger,* 68 Cal.2d 245, 66 Cal.Rptr. 20, 25, 437 P.2d 508, 513 (1968), on which the *Thorne* court relied, this is defined as "work dangerous in the absence of special precautions."

made regular examinations to ascertain the practices being followed by REECO, and was reasonably satisfied from its examinations that appropriate guidelines were being followed, this might well have been found by the trier of fact to suffice. No such examination was conducted here and the district court found that the AEC had failed to exercise reasonable or any care to see that proper safety precautions were taken by REECO with reference to work performed in the neighborhood of the power line. It stated:

"* * * AEC did nothing to ascertain whether REECO was fulfilling its contractual obligations to safely provide for the workers."

*Id.* at 547.

We conclude that the district court's determination of the rule that Nevada courts will adopt is reasonable; that under Nevada law as found by the district court a duty of care was owed by the AEC to REECO employees to take reasonable steps to assure that REECO was taking proper precautions respecting the hazards presented by engaging in work near the power line; and that the court's finding that AEC failed to meet its duty in this respect was not clearly erroneous.

### The "Discretionary Function" Exception

By 28 U.S.C. § 2680(a) the provisions of the Tort Claims Act do not apply to a claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." In *Driscoll v. United States,* 525 F.2d 136, 138 (9th Cir. 1975), this court recognized that "the discretionary function exception is limited to decisions made at the *planning* rather than the *operational* level."[3]

3. In *Driscoll,* the United States, charged with negligence in failing to establish traffic control devices, contended that liability should attach only for negligent operation or maintenance of traffic devices and should not attach for a failure to establish them, since the latter was the

The United States contends that it delegated to REECO *all* responsibility for safety precautions, retaining no duties whatsoever; that this was done as matter of policy, and, under the discretionary function exception, is not subject to judicial review or to being set aside by local law. It relies upon *Blaber v. United States,* 332 F.2d 629, 631 (2d Cir. 1964), where it was stated:

"[W]hen the [Atomic Energy] Commission decides the extent to which it will undertake to supervise the safety procedures of private contractors, it is exercising discretion at one of the highest planning levels."

It may perhaps be questioned whether the government can administratively immunize itself from tort liability under applicable state law as a matter of "policy." However, we need not reach that question. Under its contract with REECO, as we have heretofore quoted it, AEC did not disassociate itself from all matters of safety or disclaim any function or concern in that respect. It reserved to itself the right to inspect the work and activities of REECO and to stop all work should REECO fail to comply with health, safety and fire protection requirements. Four AEC employees were engaged in the review of REECO's safety program.

As a matter of policy, then, the AEC chose to retain some responsibility over matters of employee safety. The meeting of that responsibility was an operational function. The manner in which responsibility was to be met was the subject of decision at the operational rather than the planning level, and accordingly was not an exercise of a discretionary function. It must, then, meet the requirements of Nevada law.

### Contributory Negligence

The government contends that recovery here is barred by McGarry's contributory negligence in two respects. First, in

result of an exercise of the discretionary function. We held that the record did not establish as matter of law that the decision not to install safety devices was made at the planning level. We remanded for more complete development of the facts.

failing to see the power line into which he drove the portadrill; second, in driving the portadrill with mast extended in violation of AEC safety rules. The district court did not reach these contentions and no findings were made respecting the negligence of McGarry in these respects.

The court ruled, as a matter of law, that death did not result from the risk created by McGarry's allegedly negligent conduct. It noted the rule that "failure to observe a hazard will bar recovery as contributory negligence only if the death resulted from the particular risk to which deceased's conduct exposed him." 370 F.Supp. at 568. It held:

"Under the set of circumstances presented by this case, the risk of electrocution was not a foreseeable result of, nor created by, decedent's actions."

*Id.*

The reasoning of the court started with language used in the Nevada case of *Los Angeles & S. L. R. Co. v. Umbaugh,* 61 Nev. 214, 123 P.2d 224, 234 (1932), to the effect that "The law will never hold it imprudent in anyone to act upon the presumption that another in his conduct will act in accordance with rights and duties of both." Applying this rule, the district court reasoned that McGarry could reasonably act upon the assumption that the wire had properly been deactivated. The court stated:

"* * * even presuming decedent knew the wires were present, he could reasonably have assumed they were not 'live' or that they had otherwise been made safe and could prudently have relied on an absence of defendant's negligence in that regard."

370 F.Supp. at 568.[4] And later:

"Even had decedent been fully aware of the overhead lines, then, the risks he foreseeably created in driving slowly beneath them with the rig extended, while

including snagging the rig or causing the rig or wire to break or causing portions of the rig to topple, did not include electrocution as a consequential danger."

*Id.* at 569.

The rule requiring that injury result from the particular risk to which plaintiff's conduct exposed him is stated as follows in W. Prosser, Law of Torts § 65, at 422 (4th ed. 1971):

"* * * plaintiff is not barred when his failure to exercise reasonable care for his own safety exposes him to a foreseeable risk of injury through one event, and he is in fact injured through another which he could not foresee."

Under this rule the question would seem to be whether, assuming McGarry's conduct to be negligent, it was foreseeable that death by electrocution would result. The district court, by its reasoning, seems to be transforming a question of negligence— whether McGarry could reasonably rely on an assumption—into a question of causation.

However, for the purposes of this discussion we accept the court's reasoning. The question, then, is whether McGarry could reasonably rely on an assumption that the wire had been deactivated. We conclude that as matter of law he could not.

We note that McGarry's death did not result directly from contact of the mast with the wire. It resulted from McGarry's making contact with the portadrill after sparks had been observed flying from a tire and oil running from the engine. The machine then was shouting at the top of its voice that the wire was live. There was, at the time McGarry made contact with the machine and was electrocuted, no room for any rational assumption that REECO had fulfilled its duty to render the wire harmless.

---

4. This suggests a determination that McGarry's conduct was not negligent at all. In this respect the trouble is that there is no indication whatsoever that McGarry acted upon such an assumption. From Dasher's testimony it would appear that neither McGarry nor Dasher was aware of the presence of the wire until contact with it caused the portadrill to behave in an extraordinary fashion. The negligence charged against McGarry was not that he proceeded upon a questionable assumption.

Further, the reasoning of the district court with respect to causation seems to us to be inconsistent with the very concept of contributory negligence. The court stated:

> "The fact remains that had defendant fulfilled its duty to deceased, as he justifiably could have assumed defendant would do, the deceased would have been unharmed even though he failed to see the lines and violated a safety regulation against moving a portadrill with the rig extended."

370 F.Supp. at 569.

The concept of contributory negligence has reference to the case where both plaintiff and defendant are at fault and the defense only comes into play where the negligence of the defendant is, arguendo, acknowledged. To hold that plaintiff's contributory negligence does not create a risk of harm, where, but for the negligence of the defendant, no harm would have occurred, would write the defense of contributory negligence off the books.

We conclude that it was error for the district court to reject the defense of contributory negligence on the grounds on which it acted. The question then remains whether in the two respects asserted by the government McGarry was contributorily negligent. Because of the ground on which the court acted it did not reach the question and no findings were made.

The government contends that on each of the two grounds McGarry was contributorily negligent as matter of law. We disagree.

As to the first ground—that McGarry was negligent for failing to see the power line—there are factors that favor McGarry. It appears that he was concentrating on his helper, Dasher, and relying on him for directions to get to the location of the drilling hole. Testimony of a safety engineer employed by AEC suggests that such reliance was reasonable. He testified that "One of the duties of guiding would also have been to watch for clearances, particularly with a rig being moved with the mast up."

Further, we note that other courts faced with a failure to avoid overhead hazards in circumstances similar to those presented here have held that the question of contributory negligence remains one for the trier of fact.[5]

As to the second ground—that McGarry was negligent in driving the rig with the mast upright—we note that under Nevada law violation of an administrative rule is not negligence per se. *Price v. Sinnott,* 85 Nev. 600, 460 P.2d 837, 839–40 (1969). Here the portadrill was driven for only a short distance—50 to 60 feet. Under the circumstances we feel that the question of negligence in this respect should be left to the trier of fact.

We conclude that upon the issue of contributory negligence the case must be remanded for further findings of fact.

*Damages.*

█ The government contends that awards of $50,000 to McGarry's daughter and $65,000 to his son were excessive as matter of law. No authority is cited for this proposition and we reject it. The substantive law of Nevada supports the damage awards made by the trial court, *see Porter v. Funkhouser,* 79 Nev. 273, 382 P.2d 216, 217 (1963). The trial court' findings in this regard were not clearly erroneous. F.R.Civ.P. Rule 52(a); *Felder v. United States,* 543 F.2d 657 (9th Cir. 1976).

Upon the issue of contributory negligence judgment is reversed and the case remanded for further findings of fact. In all other respects judgment is affirmed.

---

5. *Austin v. Riverside Portland Cement Co.,* 44 Cal.2d 225, 282 P.2d 69, 74 (1955) (a crane came into contact with an overhead wire); *Nevis v. Pacific Gas & Electric Co.,* 43 Cal.2d 626, 275 P.2d 761, 765 (1954) (a hay derrick came into contact with a power wire); *Dunn v. Pac. Gas & Electric Co.,* 43 Cal.2d 265, 272 P.2d 745, 752 (1954) (an elevated bed of a dump truck came in contact with wires); *Jackson v. Utica Light & Power Co.,* 64 Cal.App.2d 885, 149 P.2d 748 (1944) (a power shovel came in contact with wires); *Polk v. Los Angeles,* 26 Cal.2d 519, 159 P.2d 931 (1945) (a tree trimmer made contact with a live wire).