Phyllis M. NELSON, etc., Plaintiff–Appellee and Cross–Appellant,

v.

UNITED STATES of America, Defendant–Appellant and Cross–Appellee,

v.

DUNCANSON–HARRELSON CO., Third Party Defendant, Appellee.

Nos. 77–1345, 77–1767.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 9, 1979.

Decided Dec. 1, 1980.

Rehearing Denied Jan. 29, 1981.

Martin J. Jarvis, Jarvis, Miller & Brodsky, Inc., San Francisco, Cal., on brief; John T. Murphy, Modesto, Cal., argued, for Nelson.

Thomas G. Wilson, Asst. U. S. Atty., San Francisco, Cal., John Simonson, Ropers, Majeski, Kohn, Bentley & Wagner, Redwood City, Cal., for Duncanson–Harrelson.

Before MERRILL and KENNEDY, Circuit Judges, and KING,* District Judge.

KENNEDY, Circuit Judge:

The principal question in this admiralty case is whether or not the Government owes a duty of care to the employees of an independent contractor which has been engaged by the Government to perform hazardous maritime work.

Appellee Phyllis M. Nelson sued the United States under the Suits in Admiralty Act, 46 U.S.C. §§ 741–752 (1976), and pursuant to 28 U.S.C. §§ 1333(1) (1976) for negligence which, she alleged, caused the death of her husband while he was working on a government contracted job. Mrs. Nelson and Duncanson–Harrelson, her decedent's employer, had earlier reached a settlement agreement for $340,000. The United States impleaded Duncanson–Harrelson seeking indemnity for any amount awarded Mrs. Nelson. The trial court held the Government liable for negligence and denied it any

* Honorable Samuel P. King, United States District Judge for the District of Hawaii, sitting by designation.

indemnity against the contractor for the former's allocable share of this fault. The Government appeals. We need not reach the indemnity issue since we decide the Government is not liable for the accident.

I

The U. S. Coast Guard awarded Duncanson–Harrelson a contract to repair a waive suppressor in San Francisco Bay off Fort Point. The waive suppressor is an aquatic barrier erected in the water to protect boats at the Coast Guard station from heavy waves caused by forces of nature or by passing ships. It is a wooden structure supported on two rows of timber piles connected on top by parallel horizontal wooden ribbons, cross–braced together by a slatted wooden face. The contractor was to remove and replace the existing bracing and sheathing, and to replace twenty piles. Albert J. Nelson, decedent, was a 30–year–old pile driver hired by Duncanson–Harrelson for this job, and he drowned on April 16, 1973, while working atop the barrier. He appears to have been washed over the side in a swell created by a passing ship.

The district court described the contract as follows: [1]

The work was being done by the contractor under a contract with the Government which required the contractor to perform the work in a skillful and workmanlike manner.

Under the contract, the contracting officer had authority to change specifications and the method and manner of performance, remove any incompetent and careless employee, and to order suspension of the work.

The contractor was responsible for complying with all applicable Federal, State, and local laws, codes, and regulations, and for taking proper health and safety precautions to protect the work, the workers, the public, and the property.

The contract contained no specific safety requirements nor any specifications with respect to the manner in which any

---

1. *Nelson v. United States of America*, No. C75–0524 (N.D.Cal. Nov. 16, 1976), Reporter's Transcript at 5–6 (Nov. 3, 1976) [hereinafter cited as District Court Decision]. *See* §§ 9(b), 12, General Provision (Construction Contract), GSA Standard Form 23–A, October, 1969 Edition, Exhibit 20, *Nelson v. United States of America*, No. C75–0524 (N.D.Cal. Nov. 16, 1976).

The Invitation for Bids contained the following provision:

19. *Safety & Health Regulations*: Attention is directed to the Safety and Health Regulations for construction issued by the Secretary of Labor in 29 C.F.R. Part 1518 (36 FR 7340), 4/17/71).

Invitation for Bids No. 12–4166–73, p. 4, Exhibit 20, *Nelson v. United States of America*, No. C75–0524 (N.D.Cal. Nov. 16, 1973). These regulations are now found in 29 C.F.R. § 1926 (1979).

The provisions of the contract bearing on safety responsibilities were as follows:

9. MATERIAL AND WORKMANSHIP

(a) . . .

(b) All work under this contract shall be performed in a skillful and workmanlike manner. The Contracting Officer may, in writing, require the Contractor to remove from the work any employee the Contracting Officer deems incompetent, careless, or otherwise objectionable.

11. SUPERINTENDENCE BY CONTRACTOR

The Contractor shall give his personal superintendence to the work or have a competent foreman or superintendent, satisfactory to the Contracting Officer, on the work at all times during progress, with authority to act for him.

12. PERMITS AND RESPONSIBILITIES

The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any applicable Federal, State, and municipal laws, codes, and regulations, in connection with the prosecution of the work. He shall be similarly responsible for all damages to persons or property that occur as a result of his fault or negligence. He shall take proper safety and health precautions to protect the work, the workers, the public, and the property of others. He shall also be responsible for all materials delivered and work performed until completion and acceptance of the entire construction work, except for any completed unit of construction thereof which theretofore may have been accepted.

General Provision (Construction Contract), Standard Form 23–A, October 1969 Ed., General Services Administration, pp. 2–3, Contract No. DOT–CG12–4166 (Jan. 17, 1973), Exhibit 20, *supra*.

of the work was to be performed, or precautions to be taken. It merely incorporated in the invitations to bid a reference to safety and health regulations issued by the Secretary of Labor.

The Government had an on–site inspector who performed under guidelines supplied in the Coast Guard Civil Engineering Manual.

The contractor was an engineering and contracting firm, skilled and experienced in the field of maritime construction and repair work.

The Government looked to the contractor to determine the manner in which the contract was to be performed.

The accident was caused by a failure to observe adequate safety precautions and work practices. The wave suppressor was partly dismantled as its piles were being replaced. Ordinarily the ribbons (horizontal planking) straddling the two rows of piles are nailed down at both ends and provide the structure with stability and rigidity. In its partially disassembled state, this rigidity was lost, and the unstable suppressor's components moved independently with the waves and swells. The trial court found:

At the time of the accident, the decedent was working on a plank which had been removed from the suppressor and placed across the ribbons. It was secured on one end by a chain and binder, but was unsecured at the other end.

The decedent was engaged in the removing of a choker from a new pile which had just been placed. A swell, apparently from a passing vessel, hit the structure causing the ribbons to spread and one end of the plank to slide off its support. The decedent fell with the plank into the water and was never found.

There were no safety lines, guard rails, [toe] boards, life lines, or nets in use. No lookout had been placed to warn of oncoming waves or swells. The boards used as a working platform were not secured to prevent their sliding off the ribbons. District Court Decision at 4–5.

■ The Government's alleged negligence lay in the failure of the on–site inspector to use his authority to stop the work when wave conditions made it particularly hazardous, and in the Government's more pervasive failure to specify and delegate safety precautions in contracting for the job and supervising the work. The trial court relied on the latter ground, and, sitting without a jury, found that the work entailed a particular risk of injury.[2] The court allocated fault and liability of eighty percent[3] to the contractor and twenty percent to the Government.

## II

Two questions concerning the correct law to be applied must be addressed. First, the existence of federal admiralty jurisdiction, and second, the precise source of plaintiff Phyllis Nelson's cause of action.

■ This case involves the admiralty jurisdiction of the district court for three reasons. The injury occurred on the navigable waters of San Francisco Bay and in the course of an activity closely connected with traditional maritime activity. *See Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). In addition, decedent Albert Nelson was injured in the course of his

---

**2.** The clearly erroneous rule applies to the trial court's fact findings in this case. *Guzman v. Pichirilo*, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962); *McAllister v. United States*, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954). However, the primary dispute in this appeal is the purely legal question set out in text at p. 470, *supra*. Although not entirely free from doubt, the analytical basis of the trial court's imposition of liability was not "that the Government had certain powers of supervision and control

over the job, and asserted them on a few occasions," but rather that the Government failed in its "duty to provide [by contract] or require the contractor to provide for the taking of [adequate] safety precautions." District Court Decision at 5–6.

**3.** Since plaintiff and Contractor had already settled, this figure was significant only in order to calculate the amount of the Government's liability.

employment as a seaman aboard the Duncanson–Harrelson Derrick Barge # 2.[4]

 The precise nature of plaintiff's cause of action was not specified either by the district court or the parties' briefs at trial or on appeal. The suit alleged negligence, and the court had jurisdiction under the Suits in Admiralty Act. The Suits in Admiralty Act, 46 U.S.C. § 742 (1976), however, does not itself provide a cause of action. It merely operates to waive the sovereign immunity of the United States in admiralty suits. In general, maritime torts, duties, and causes of action are somewhat analogous to land–based torts. Prior to the case of *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), there was no general maritime common law cause of action for wrongful death; state wrongful death acts were applied by federal courts sitting in admiralty. We have found no case deciding whether a *Moragne* suit may be based on negligence as well as unseaworthiness. *But see* G. Gilmore & C. Black, The Law of Admiralty 368 (2d ed. 1975) (*Moragne* governs wrongful death actions based on negligence). We hold that the need for uniformity in mari-

time wrongful death actions requires extension of *Moragne* to cover claims based on negligence, to the exclusion of state wrongful death statutes. *See Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978); *In re S/S Helena*, 529 F.2d 744 (5th Cir. 1976) (Wisdom, J.); *Law v. Sea Drilling Corp.*, 523 F.2d 793 (5th Cir. 1975).

### III

The distinctive issue in this suit is the alleged liability of the United States, the owner of the work and employer of the independent contractor Duncanson–Harrelson, for an injury to the Contractor's employee, decedent Albert Nelson. We find no case in this or any other circuit addressing this aspect of an owner's liability under admiralty law. Cases such as *McGarry v. United States*, 549 F.2d 587 (9th Cir. 1976), *cert. denied*, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977), and *Thorne v. United States*, 479 F.2d 804 (9th Cir. 1973), were decided under the Federal Tort Claims Act and required the application of "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b) (1976).[5] Inter-

---

**4.** Plaintiff Phyllis Nelson alleged, defendant conceded, and the trial court impliedly found that Albert Nelson was a seaman. *See* Complaint at 2; Plaintiff's Pre–Trial Statement at 1; Trial Memorandum of Defendant United States of America at 6, District Court Decision at 10 (stating decedent had Jones Act remedy against employer). This conclusion is supported by allegations of Mr. Nelson's performance of traditional seaman's duties aboard the barge. *See* Plaintiff's Pre–Trial Statement at 4. In addition, it is by now fairly clear that one who is employed on a barge for performing maritime work is a seaman. *See Grimes v. Raymond Concrete Pile Co.*, 356 U.S. 252, 78 S.Ct. 687, 2 L.Ed.2d 737 (1958) (per curiam); *Senko v. La Crosse Dredging Corp.*, 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404 (1957); *Gianfala v. Texas Co.*, 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 775 (1955) (per curiam); *Offshore Co. v. Robison*, 266 F.2d 769, 779 (5th Cir. 1959) (Wisdom, J.); *Porche v. Gulf Miss. Marine Corp.*, 390 F.Supp. 624 (E.D.La.1975); *Spratley v. Tidewater Constr. Corp.*, 238 F.Supp. 650 (E.D. Va.1965); 4 A. Larson, The Law of Workmen's Compensation §§ 90.00–90.27 (1980); 1 M. Norris, The Law of Maritime Personal Injuries §§ 8–12 (3d ed. 1975).

Nelson's status as a seaman by virtue of his connection with the barge is not only important for purposes of Part III, *infra*, but also because it obviates consideration of the question whether it was significant that his injury occurred on the wave suppressor, a structure permanently affixed to the sea floor. *See Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969) (statutory limitation of admiralty jurisdiction); G. Gilmore & C. Black, The Law of Admiralty 333–34 (2d ed. 1975).

**5.** The district court in *McGarry* held that Nevada state courts would apply the California decisions interpreting section 413, 370 F.Supp. 525, 564 (D.Nev.1973), *aff'd in part and rev'd in part*, 549 F.2d 587, 590 (9th Cir. 1976), *cert. denied*, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977), and we properly deferred to the district judge's interpretation of state law. *See, e. g., Bishop v. Wood*, 426 U.S. 341, 344–46, 96 S.Ct. 2074, 2077–2078, 48 L.Ed.2d 684 (1976); *American Timber & Trading Co. v. First Nat'l Bank*, 511 F.2d 980, 983 (9th Cir. 1974), *cert. denied*, 421 U.S. 921, 95 S.Ct. 1588, 43 L.Ed.2d 789 (1975).

In addition to the need to apply a different source of law from that which controlled

pretation of the tort law of individual states by state or federal courts is helpful in deciding this appeal, but not precisely controlling inasmuch as the source and substance of maritime law is federal and independent.

We are confronted at the threshold of this issue by appellant's argument that *West v. United States*, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959), is controlling admiralty law on this point and requires reversal of plaintiff's judgment. Appellee argues that the facts of *West* distinguish its holding from the question before us so that it does not control the question of the duty owed by the United States to this decedent. We agree with the appellee: the nature of the dangers giving rise to the injury in *West* and in this case are significantly different. The manner in which the contractor performed the work in *West* introduced danger to an otherwise safe activity and workplace. *See West v. United States*, 143 F.Supp. 473, 476 (E.D.Pa.1956) (fall of metal plug which injured plaintiff due either to pressurized water introduced by fellow workmen or to being dropped by fellow workmen), *aff'd*, 256 F.2d 671, 672 (3d Cir. 1958) (accident occurred "because a fellow employee of the contractor did a positive and negligent act"), *aff'd*, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959). It is in light of these facts that *West*'s requirement, that the danger be due to the manner in which the work is carried out for the contractee to escape liability, must be understood. As will be more fully explained below in our discussion of the Restatement, the regular battering of the workplace by heavy wages rendered this job peculiarly and inherently risky in a way quite different from the danger presented in *West.* We therefore must decide the nature of the duty owed by one who employs an independent contractor to the contractor's employees in the context of the special duties and dangers of work performed in circumstances where maritime law controls.

Both parties agree that, apart from *West*, the principle to be interpreted in this case is found in the following section of the Restatement of Torts:

> § 413. Duty to Provide for Taking of Precautions Against Dangers Involved in Work Entrusted to Contractor
>
> One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to *others* unless special precautions are taken, is subject to liability for physical harm caused to them by the absence of such precautions if the employer
>
> (a) fails to provide in the contract that the contractor shall take such precautions, or
>
> (b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions.

Restatement (Second) of Torts § 413 (1965) (emphasis added). Application of this provision to the facts of this case turns on the meaning of the critically ambiguous term "others." Does the owner's duty of care, to provide for the taking of safety precautions, extend to the contractor's employees, or only to third parties and the public at large?

There are two conflicting lines of authority on this point. *Compare McGarry v. United States*, 549 F.2d 587, 590–91 (9th Cir. 1976), *cert. denied*, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977) (Nevada law) (duty extends to employers) *and Lindler v. District of Columbia*, 502 F.2d 495, 498–99 (D.C.Cir.1974) (District of Columbia law) (same) *with Bramer v. United States*, 595 F.2d 1141, 1144–46 & nn. 8–11 (9th Cir. 1979) (New Mexico law) (duty does not ex-

*McGarry*, our case is distinguished factually by the important role the federal defendant in *McGarry* chose to retain in the job's safety program. The AEC had "four employees located at NTS whose duties were primarily concerned with safety. The function of those individuals was to appraise a contractor's perform-ance relating to safety practices." *Id.*, 549 F.2d at 590. We held only that where an owner chooses to involve itself in this way with a safety program, the owner may be liable for a foreseeable injury which was not anticipated by "appropriate guidelines," *id.* at 591.

tend to employees) *and King v. Shelby Rural Elec. Coop.*, 502 S.W.2d 659, 663 (Ky.Ct. App.1973), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 235 (1974) (Kentucky law) (same).[6] These cases, and the numerous parallel authorities they in turn cite, support their respective positions by choosing between a policy designed to reduce injuries by providing for the contractor's and owner's clear allocation of safety responsibilities, on the one hand, and the avoidance of perverse or fortuitous liability for injury on the other.

The latter position rests on consideration of the general effect on liability of workmen's compensation laws, which abrogate the common law right to sue an employer in tort in return for a certain but relatively smaller payment to the injured employee. To the extent that workmen's compensation laws represent a preferred scheme for redress of occupational injuries, it does appear anomalous and fortuitous for an employee to be in a better position through a revived, as it were, claim against a third party owner than he would be in had his injury occurred in the scope of employment by the owner directly. Stated another way, it is

argued that an owner should not incur greater exposure by hiring a qualified independent contractor than he would have by using his own employees, who would be limited to a compensation remedy. *See Bramer v. United States*, 595 F.2d 1141, 1146 n.10 (9th Cir. 1979).[7]

The contrary position, adopted in the *Lindler* and *McGarry* decisions, may be justified as a way to minimize the costs of accidents and their avoidance. The independent contractor exception to the doctrine of respondeat superior rests on the general tort principle that in different circumstances different parties to the employment relation will know best how to avoid an accident and to weigh the costs and benefits of various precautions as against the costs and probability of the accident to be avoided. One commentator has described this principle in relation to the independent contractor exception:

> An employer is not liable for the torts committed by independent contractors in his hire. This doctrine is justified in terms of our analysis if an independent contractor is defined as a party who would, *a priori*, be more likely to consider

---

**6.** For other authorities on this question, see *Hess v. Upper Miss. Towing Corp.*, 559 F.2d 1030, 1033–34 (5th Cir. 1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1489, 55 L.Ed.2d 518 (1978); *Parsons v. Amerada Hess Corp.*, 422 F.2d 610, 612–14 & n.1 (10th Cir. 1970); *New Mexico Elec. Serv. Co. v. Montanez*, 89 N.M. 278, 551 P.2d 634, 637–38 (1976). *Cf. Johnston v. United States*, 461 F.Supp. 991, 993 (N.D.Fla.1978), *aff'd mem.*, 603 F.2d 858 (5th Cir. 1979) (suggesting even if "employees" are "others," lesser standard of care owed than to members of public). *See also Vagle v. Pickands Mather & Co.*, 611 F.2d 1212 (8th Cir. 1979) (Minnesota law, vicarious negligence), *cert. denied*, 444 U.S. 1033, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980).

**7.** Although, as we note below, there may be separate reasons in a maritime setting for distinguishing decisions excluding employees from the Restatement's definition of "others," we note that the policy and effect of workmen's compensation laws is not completely uniform. In some states, for example, an employer's liability is not limited to workmen's compensation if there is misconduct or gross negligence in relation to providing safety devices. In such cases the employee may elect between common law and compensation remedies. *See generally*, 2A A. Larson, The Law of Workmen's Com-

pensation § 69 (1976 & Supp.1979). An additional consideration for delineating the scope of "others" in section 413 of the Restatement in the context of wrongful death actions is that in a few states a wrongful death action is treated as different from the injured decedent's own cause of action, and so may not be held barred by workmen's compensation acts. *See, e. g., Ransmeier v. Camp Cody, Inc.*, 117 N.H. 736, 378 A.2d 752 (1977); *Alizzi v. Employers Ins.*, 351 So.2d 258 (La.Ct.App.1977), *writ denied*, 353 So.2d 1037 (La.1978). *See generally* 2A A. Larson, *supra*, § 66.

The mirror image of the definitional question in § 413 of "others" is the question under workmen's compensation laws of who are third persons not immune from suit by injured workers as contrasted with those who enjoy the employer's immunity from suit by virtue of hiring the employer. *See* 2A A. Larson, *supra*, §§ 72.00–72.40; McCoid, *The Third Person in the Compensation Picture: A Study of the Liabilities and Rights of Non-Employers*, 37 Tex.L. Rev. 389 (1959).

The above exceptions are atypical, however, and in general this policy is accurately characterized by appellants.

the risk in his market decisions than would his employer .... [T]hough a home owner who hires a tree surgeon to chop down a tree is about as good a risk spreader as his independent contractor, he is less good at allocating costs.

Calabresi, *Some Thoughts on Risk Distribution and the Law of Torts*, 70 Yale L.J. 499, 545 (1961) (footnote omitted). In some cases, however, the job the owner contracts out is "likely to create . . . a peculiar unreasonable risk of physical harm." Restatement (Second) of Torts § 413 (1965). In these cases there is a special reason to place initial responsibility on the employer if he is "more likely to consider the risk" and better able to assess ways to mitigate the risk. Calabresi, *Optimal Deterrence and Accidents*, 84 Yale L.J. 656 (1975). *See* Calabresi, *supra*, 70 Yale L.J. at 547. He can be relieved of liability, according to this approach, if he makes what the law considers appropriate and reasonable provision by contractual or other precautions.

Therefore it seems reasonable to include or to exclude employees of the independent contractor from the definition of "others" in the Restatement depending on the relation between the owner and the contractor. If there is an unusual hazard, the owner can hire a contractor particularly skilled in the specific risk which makes the project unusually dangerous, as was done here. The *Lindler* view would additionally require that the owner spell out, with a specificity suitable to the degree and kind of risk involved, the safety precautions which the contractor is to observe. Only then would the *Lindler* interpretation consider that the owner had paid the cost of his enterprise by hiring a contractor whose readiness to engage in unusually dangerous work will be reflected in the latter's explicit contractual responsibility for specific and appropriate safety precautions. *See* W. Prosser, Handbook of the Law of Torts 469 (4th ed. 1971); Calabresi, *supra*, 70 Yale L.J. at 545–46; Note, *Risk Administration in the Marketplace: A Reappraisal of the Independent Contractor Rule*, 40 U.Chi.L.Rev. 661, 675–79 (1973) (joint liability for contractee and contractor coupled with contractual distribution of risk most rational rule). The opposite conclusion would follow from the *Lindler* approach when a job, the dangers of which are particularly within the knowledge and enterprise of the owner, is hired out without the liability for danger to employees and public alike having been allocated by clear and specific contract terms to the contractor.

The facts of this case seem to have suggested to the trial court this latter situation and the corresponding approach to section 413:

> The wave suppressor is located in deep water about 50 yards offshore in water which was hazardous because of tides, wave action, and swells, and over a rocky sea floor.

> The fact that the Coast Guard considered the wave suppressor to be needed at that location is an indication of the magnitude of the wave and tidal action in the area.

. . . . .

> Here, the Government knew or should have known that the work would be conducted in fairly deep offshore water subject to strong tides, wave action, currents and swells, that it would be carried on in and around the partially dismantled wave suppressor which, in that condition, would be unstable and, therefore, subject to various kinds of internal motion. It knew that this was a unique project requiring safety precautions specifically designed and [adapted] to this operation, and not at all analogous to work carried on, say, in the context of a standard scaffolding or type of routine structures. The Government knew or should have known that the partially dismantled wave suppressor could not provide a stable platform where one was needed and it was, therefore, under a duty to provide or require the contractor to provide for the taking of such safety precautions adequate to protect the workers using the wave suppressor as a platform.

District Court Decision at 4, 8. The trial court implied that the Government did not

adequately specify the safety precautions to be followed by the contractor:

The Government's duty in the present circumstances was not discharged by a generalized reference in the bid invitation to safety and health regulations, nor by the generalized references in the contract document to the contractor's obligation to conduct the work in a skillful and workmanlike manner. Moreover, the Government, through its inspector, knew or had reason to know of the risk of harm inherent in the work by reason of the fact that these conditions existed on the site for some three to seven days before the accident occurred during which period the work was in progress and were, therefore, observed by the Government's inspector.

*Id.* at 8–9.[8]

■ These, then, are the considerations supporting the conflicting definitions of the term "others" in section 413 of the Restatement. The distinctive features of maritime duties were used by the trial court in an attempt to incorporate the advantages of the broader interpretation while avoiding the drawbacks cited in decisions that refuse to include employees of an independent contractor in the definition of "others." It is true as a general proposition that the remedy of state workmen's compensation statutes, as well as their preemption of common law causes of action, does not extend to injuries on navigable waters, and more specifically, the liability of an employer for negligence is not limited to a compensation award when the situs is maritime, even when he uses his own employees: the employees have a Jones Act recovery.[9] As discussed above, decedent Albert Nelson was a seaman for the purposes of this construction and repair contract. As such, he had a Jones Act remedy against his employer for negligence, irrespective of whether his employer was an independent contractor

hired by the owner, or the owner himself, performing the work with his own employees. *See* 46 U.S.C. § 688 (1976). In such a case, the trial court believed there would be no fortuitous effect of the sort urged against including employees within the definition of "others," an effect by which an owner's exposure to actions for his negligence is greater when an independent contractor is employed than it would be otherwise.

### IV

■ Before ruling on the merits of the trial court's theory of an owner's tort liability, it is important to clarify the precise nature of the duty allegedly breached by the Government. Issues of retained control or strict liability for extra–hazardous activity are not involved. *Cf. Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972) (United States not strictly liable for extra–hazardous activity under Federal Tort Claims Act); *Williams v. Fenix & Scisson, Inc.,* 608 F.2d 1205, 1209–14 (9th Cir. 1979) (concurring opinion) (contractual liability for safety may be implied from conduct); *Bramer v. United States,* 595 F.2d 1141, 1146 n.11 (9th Cir. 1979) (right to inspect and approve); *Market Ins. Co. v. United States,* 415 F.2d 459 (5th Cir. 1969); *Kirk v. United States,* 270 F.2d 110 (9th Cir. 1959) (retained control); *Hammond v. Bechtel Inc.,* 606 P.2d 1269 (Alaska 1980) (retained control). The essence of the duty which the trial court found violated in this case was the United States' nondelegable duty, imposed by section 413 of the Restatement, to provide contractually for the contractor's observance of detailed and specific safety precautions. *See* District Court Decision at 8–9, 10–11. In short, the Government was found liable for having written a certain kind of contract, a contract found too vague on one point.

8. There was testimony to support the trial court's conclusion that the government could have more effectively delineated the responsibility for appropriate precautions. *See* Record, Vol. IV at 329–50 (Knutson testimony); *id.* at 438–44 (Leverett testimony).

9. For qualifications to this general proposition, see the discussion of maritime/compensation "twilight zones" in 4 A. Larson, *supra* note 4, at §§ 90.41–90.52; 1 M. Norris, *supra* note 4, at §§ 56–61.

We believe it is inappropriate in this case to impose liability on the Government. We do not think employees of an independent contractor should be included in these circumstances within the Restatement's definition of "others" for reasons based on the nature of the particular danger and the particular owner involved here.

To begin with, the rationale of the independent contractor exception, as well as criticisms of it, are most soundly based on issues of knowledge and secondary or indirect costs of avoiding accidents. The decision to place liability on one group of potential defendants stems from the recognition that, because of greater knowledge about or ability to reduce safety risks, the placement of liability on this group will keep the number and costs of accidents, both in economic and human terms, at a minimum.[10] In this case, as the trial court itself observed, "the Government was not privy to any particular knowledge which was not available to the contractor." District Court Decision at 12. There is no suggestion here that the Government was in a better position than the contractor either to anticipate dangers to workmen, to foresee and evaluate the best methods of protection, or to implement and enforce compliance with appropriate on–site safety precautions. As long as an independent contractor is informed about particular safety risks, and is competent and solvent, there is no reason in law or policy why he alone should not be fully responsible for injuries to workmen arising out of the performance of inherently dangerous jobs in which the contractor has special skill and experience not shared with the owner.

Approaching this and similar problems from a more concrete perspective, the theory applied by the trial court would, to some extent, simply invalidate the previously valid independent contractor/owner relation as a practical matter. As we interpret the theory of the appellee and the trial court, the owner of a site where an inherently or peculiarly risky job is to be performed must, to escape this nondelegable tort liability, perform a preliminary analysis of special job–related safety risks and design a program of safety precautions which he will then write into his bid specifications. In addition, he may or may not be responsible to the contractor's employees for monitoring of the contractor's compliance with the specified procedures. In practice, this would amount to a judicial fiat that owner and contractor become partners in the design and supervision of safety aspects of unusually risky jobs. In circular fashion, the owner's involuntary involvement to this degree would in itself provide an additional ground for holding the owner further liable. See W. Prosser, supra, at 469. This would be an ambitious incursion into private contractual relationships, and there is no reason to suppose it would result in a safety benefit to workers in those cases where the contractor is as able, if not more so, than the owner to anticipate safety problems and to enforce appropriate safety programs. When the general policy implications of workmen's compensation schemes are added to the foregoing additional reasons against a departure from the majority interpretation of section 413 in this case, we conclude that the balance weighs heavily in favor of appellant's position.

There are, however, stronger reasons for reversing the trial court's tort reasoning in this case by virtue of the nature of the defendant. First, as we have noted, the trial court's main analytical point in avoidance of the Government's workmen's compensation policy arguments was the existence of a Jones Act remedy, because decedent A. J. Nelson was a seaman:

Inasmuch as the decedent had a statutory cause of action against his employer under the Jones Act and was not limited to an exclusive Workmen's Compensation–type remedy, the policy reasons which might otherwise preclude an action by an employee against the owner of the property are not applicable here and there is no danger in this case of avoiding

---

10. See, e. g., Calabresi, Transaction Costs, Resource Allocation, and Liability Rules, 11 J.Law & Econ. 67 (1968); Coase, The Problem of Social Cost, 3 J.Law & Econ. 1 (1960).

or negating the policy of Workmen's Compensation-type cases by allowing circuitous recovery of the employee against his employer.

District Court Decision at 10. By adopting this course, however, the court avoided one "circuitous recovery" only to adopt another. It is clear that when the Government employs a seaman directly, he does not have a Jones Act remedy against the United States in an action brought under the Suits in Admiralty Act. *See Johansen v. United States*, 343 U.S. 427, 72 S.Ct. 849, 96 L.Ed. 1051 (1952); G. Gilmore & C. Black, The Law of Admiralty 284 n.23 (2d ed. 1975). Because of the relatively fortuitous fact that Nelson was employed indirectly, rather than directly, by the Government, under the appellee's theory he occupies a better, and the Government a worse, position for reasons totally unrelated to the danger of the work performed or the adequacy of the safety supervision protecting workers.

We hold, therefore, that under the general admiralty law the United States is not liable for injuries to the employees of its independent contractors arising out of the performance of inherently and peculiarly dangerous work in circumstances in which the contractor is solvent and is as well informed and competent as the Government in the methods necessary to avoid accidental injuries to workers, absent significant Government involvement in safety aspects of the job or a Government act aggravating the job's danger.

For the foregoing reasons, the decision below is REVERSED, the judgment against the Government is VACATED, and the case is REMANDED with instructions to dismiss appellee's suit.